**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 10-2347

LIBERTY UNIVERSITY, INCORPORATED, a Virginia Nonprofit
Corporation; MICHELE G. WADDELL; JOANNE V. MERRILL,

Plaintiffs - Appellants,

and

MARTHA A. NEAL; DAVID STEIN, M.D.; PAUSANIAS ALEXANDER; MARY
T. BENDORF; DELEGATE KATHY BYRON; JEFF HELGESON,

Plaintiffs,

v.

JACOB LEW, Secretary of the Treasury of the United States,
in his official capacity; KATHLEEN SEBELIUS, Secretary of
the United States Department of Health and Human Services,
in her official capacity; SETH HARRIS, Acting Secretary of
the United States Department of Labor, in his official
capacity; ERIC H. HOLDER, JR., Attorney General of the
United States, in his official capacity,

Defendants - Appellees.

------------------------------------------

MOUNTAIN STATES LEGAL FOUNDATION; REVERE AMERICA FOUNDATION;
AMERICAN CIVIL RIGHTS UNION; FAMILY RESEARCH COUNCIL; BREAST
CANCER PREVENTION INSTITUTE; LIFE LEGAL DEFENSE FOUNDATION;
LANDMARK LEGAL FOUNDATION; PROJECT LIBERTY; DAVID BOYLE;
MEMBERS OF LEGATUS; CATHOLIC MEDICAL ASSOCIATION; FOUNDATION
FOR MORAL LAW; VIRGINIA FAMILY FOUNDATION; WEST VIRGINIA
FAMILY POLICY COUNCIL; MARYLAND FAMILY ALLIANCE; NORTH
CAROLINA FAMILY POLICY COUNCIL; PALMETTO FAMILY COUNCIL;
AMERICANS UNITED FOR LIFE; ALLIANCE DEFENDING FREEDOM,

Amici Supporting Appellants,

AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INCORPORATED; AMERICAN NURSES ASSOCIATION; AMERICAN ACADEMY OF PEDIATRICS, INCORPORATED; AMERICAN MEDICAL STUDENT ASSOCIATION; CENTER FOR AMERICAN PROGRESS, d/b/a Doctors for America; NATIONAL HISPANIC MEDICAL ASSOCIATION; NATIONAL PHYSICIANS ALLIANCE; HARRY REID, Senate Majority Leader; NANCY PELOSI, House Democratic Leader; DICK DURBIN, Senator, Assistant Majority Leader; CHARLES SCHUMER, Senator, Conference Vice Chair; PATTY MURRAY, Conference Secretary; MAX BAUCUS, Senator, Committee on Finance Chair; TOM HARKIN, Senator, Committee on Health, Education, Labor and Pensions Chair; PATRICK LEAHY, Senator, Committee on the Judiciary Chair; BARBARA MIKULSKI, Senator, HELP Subcommittee on Retirement and Aging Chair; JOHN D. ROCKEFELLER, IV, Senator, Committee on Commerce Chair; STENY HOYER, Representative, House Democratic Whip; JAMES E. CLYBURN, Representative, Democratic Assistant Leader; JOHN B LARSON, Representative, Chair of Democratic Caucus; XAVIER BECERRA, Representative, Vice Chair of Democratic Caucus; JOHN D DINGELL, Representative, Sponsor of House Health Care Reform Legislation; HENRY A. WAXMAN, Representative, Ranking Member, Committee on Energy and Commerce; FRANK PALLONE, JR., Representative, Ranking Member, Commerce Subcommittee on Health; SANDER M LEVIN, Representative, Ranking Member, Committee on Ways and Means; FORTNEY PETE STARK, Representative, Ranking Member, Ways and Means Subcommittee on Health; ROBERT E. ANDREWS, Representative, Ranking Member, Education and Workforce Subcommittee on Health; JERROLD NADLER, Representative, Ranking Member, Subcommittee on Constitution; GEORGE MILLER, Representative, Ranking Member, Education and the Workforce Committee; JOHN CONYERS, JR., Representative, Ranking Member, Committee on the Judiciary; JACK M BALKIN, Knight Professor of Constitutional Law and the First Amendment, Yale Law School; GILLIAN E METZGER, Professor of Law, Columbia Law School; TREVOR W MORRISON, Professor of Law, Columbia Law School; AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES; THE ARC OF THE UNITED STATES; BREAST CANCER ACTION; FAMILIES USA; FRIENDS OF CANCER RESEARCH; MARCH OF DIMES FOUNDATION; MENTAL HEALTH AMERICA; NATIONAL BREAST CANCER COALITION; NATIONAL ORGANIZATION FOR RARE DISORDERS; NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES; NATIONAL SENIOR CITIZENS LAW CENTER; NATIONAL WOMEN'S HEALTH NETWORK; THE OVARIAN CANCER NATIONAL ALLIANCE; AMERICAN HOSPITAL ASSOCIATION; ASSOCIATION OF AMERICAN MEDICAL COLLEGES; FEDERATION OF AMERICAN HOSPITALS; NATIONAL ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS; CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES; NATIONAL

ASSOCIATION OF CHILDREN'S HOSPITALS; CHRISTINE O GREGOIRE, Governor; DR. DAVID CUTLER, Deputy, Otto Eckstein Professor of Applied Economics, Harvard University; DR. HENRY AARON, Senior Fellow, Economic Studies Bruce and Virginia MacLaury Chair, The Brookings Institution; DR. GEORGE AKERLOF, Koshland Professor of Economics, University of California-Berkeley, 2001 Nobel Laureate; DR. STUART ALTMAN, Sol C. Chaikin Professor of National Health Policy, Brandeis University; DR. KENNETH ARROW, Joan Kenney Professor of Economics and Professor of Operations Research, Stanford University, 1972 Nobel Laureate; DR. SUSAN ATHEY, Professor of Economics, Harvard University, 2007 Recipient of the John Bates Clark Medal for the most influential American economist under age 40; DR. LINDA J. BLUMBERG, Senior Fellow, The Urban Institute, Health Policy Center; DR. LEONARD E. BURMAN, Daniel Patrick Moynihan Professor of Public Affairs at the Maxwell School, Syracuse University; DR. AMITABH CHANDRA, Professor of Public Policy Kennedy School of Government, Harvard University; DR. MICHAEL CHERNEW, Professor, Department of Health Care Policy, Harvard Medical School; DR. PHILIP COOK, ITT/Sanford Professor of Public Policy, Professor of Economics, Duke University; DR. CLAUDIA GOLDIN, Henry Lee Professor of Economics, Harvard University; DR. TAL GROSS, Department of Health Policy and Management, Mailman School of Public Health, Columbia University; DR. JONATHAN GRUBER, Professor of Economics, MIT; DR. JACK HADLEY, Associate Dean for Finance and Planning, Professor and Senior Health Services Researcher, College of Health and Human Services, George Mason University; DR. VIVIAN HO, Baker Institute Chair in Health Economics and Professor of Economics, Rice University; DR. JOHN F. HOLAHAN, Ph. D., Director, Health Policy Research Center, The Urban Institute; DR. JILL HORWITZ, Professor of Law and Co-Director of the Program in Law & Economics, University of Michigan School of Law; DR. LAWRENCE KATZ, Elisabeth Allen Professor of Economics, Harvard University; DR. FRANK LEVY, Rose Professor of Urban Economics, Department of Urban Studies and Planning, MIT; DR. PETER LINDERT, Distinguished Research Professor of Economics, University of California, Davis; DR. ERIC MASKIN, Albert O. Hirschman, Professor of Social Science at the Institute for Advanced Study, Princeton University, 2007 Nobel Laureate; DR. ALAN C. MONHEIT, Professor of Health Economics, School of Public Health, University of Medicine & Dentistry of New Jersey; DR. MARILYN MOON, Vice President and Director Health Program, American Institutes for Research; DR. RICHARD J. MURNANE, Thompson Professor of

Education and Society, Harvard University; DR. LEN M. NICHOLS, George Mason University; DR. HAROLD POLLACK, Helen Ross Professor of Social Service Administration, University of Chicago; DR. MATTHEW RABIN, Edward G. and Nancy S. Jordan Professor of Economics, University of California-Berkeley, 2001 Recipient of the John Bates Clark Medal for the most influential American economist under age 40; DR. JAMES B. REBITZER, Professor of Economics, Management, and Public Policy, Boston University School of Management; DR. MICHAEL REICH, Professor of Economics, University of California at Berkeley; DR. THOMAS RICE, Professor, UCLA School of Public Health; DR. MEREDITH ROSENTHAL, Department of Health Policy and Management, Harvard University, Harvard School of Public Health; DR. CHRISTOPHER RUHM, Professor of Public Policy and Economics, Department of Economics, University of Virginia; DR. JONATHAN SKINNER, Professor of Economics, Dartmouth College, and Professor of Community and Family Medicine, Dartmouth Medical School; DR. KATHERINE SWARTZ, Professor, Department of Health Policy and Management, Harvard School of Public Health; DR. KENNETH WARNER, Dean of the School of Public Health and Avedis Donabedian Distinguished University Professor of Public Health, University of Michigan; DR. PAUL N. VAN DE WATER, Senior Fellow, Center on Budget and Policy Priorities; DR. STEPHEN ZUCKERMAN, Senior Fellow, The Urban Institute; NATIONAL WOMEN'S LAW CENTER; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES; AMERICAN MEDICAL WOMEN'S ASSOCIATION; ASIAN & PACIFIC ISLANDER AMERICAN HEALTH FORUM; BLACK WOMEN'S HEALTH IMPERATIVE; CHILDBIRTH CONNECTION; IBIS REPRODUCTIVE HEALTH; INSTITUTE OF SCIENCE AND HUMAN VALUES; MARYLAND WOMEN'S COALITION FOR HEALTH CARE REFORM; MENTAL HEALTH AMERICA; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; NATIONAL ASSOCIATION OF SOCIAL WORKERS; NATIONAL COALITION FOR LGBT HEALTH; NATIONAL COUNCIL OF JEWISH WOMEN; NATIONAL COUNCIL OF WOMEN'S ORGANIZATIONS; NATIONAL EDUCATION ASSOCIATION; NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH; OLDER WOMEN'S LEAGUE; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; RAISING WOMEN'S VOICES; SARGENT SHRIVER NATIONAL CENTER ON POVERTY LAW; SOUTHWEST WOMEN'S LAW CENTER; WIDER OPPORTUNITIES FOR WOMEN; WOMEN'S LAW CENTER OF MARYLAND, INCORPORATED; WOMEN'S LAW PROJECT; PHYSICIANS FOR REPRODUCTIVE HEALTH; AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS; AMERICAN SOCIETY FOR EMERGENCY CONTRACEPTION; ASSOCIATION OF REPRODUCTIVE HEALTH PROFESSIONALS; AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE; SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; AMERICAN MEDICAL WOMEN'S ASSOCIATION; NATIONAL ASSOCIATION OF NURSE

PRACTITIONERS IN WOMEN'S HEALTH; SOCIETY OF FAMILY PLANNING; JAMES TRUSSELL; SUSAN F. WOOD; DON DOWNING; KATHLEEN BESINQUE; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; THE ANTI-DEFAMATION LEAGUE; THE INTERFAITH ALLIANCE FOUNDATION; THE NATIONAL COALITION OF AMERICAN NUNS; THE NATIONAL COUNCIL OF JEWISH WOMEN; THE RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; THE RELIGIOUS INSTITUTE; THE UNITARIAN UNIVERSALIST ASSOCIATION; THE UNITARIAN UNIVERSALIST WOMEN'S FEDERATION,

Amici Supporting Appellees.

---

On Remand from the Supreme Court of the United States.
(S. Ct. No. 11-438)

---

Argued: May 16, 2013                    Decided: July 11, 2013

---

Before MOTZ, DAVIS, and WYNN, Circuit Judges.

---

Affirmed by published opinion. Judge Motz, Judge Davis, and Judge Wynn wrote the opinion.

---

**ARGUED:** Mathew D. Staver, LIBERTY COUNSEL, Maitland, Florida, for Appellants. Alisa Beth Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Anita L. Staver, LIBERTY COUNSEL, Maitland, Florida; Stephen M. Crampton, Mary E. McAlister, LIBERTY COUNSEL, Lynchburg, Virginia, for Appellants. Timothy J. Heaphy, United States Attorney, Roanoke, Virginia; Neal Kumar Katyal, Acting Solicitor General, Tony West, Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Samantha L. Chaifetz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Joel M. Spector, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, for Amicus Mountain States Legal Foundation. Brian S. Koukoutchos, Mandeville, Louisiana; Charles J. Cooper, David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., for Amicus Revere America Foundation. Peter Ferrara, AMERICAN CIVIL RIGHTS UNION, Falls Church, Virginia; Daniel M. Gray, LAW OFFICES OF DANIEL M. GREY, LLC, Falls Church, Virginia; Richard B. Rogers, RICHARD B. ROGERS,PLC, Alexandria, Virginia, for Amicus American Civil Rights Union. Kenneth A. Klukowski, FAMILY RESEARCH COUNCIL, Washington, D.C., for Amicus Family

5

Research Council. Scott J. Ward, Timothy R. Obitts, GAMMON & GRANGE, P.C., McLean, Virginia; Catherine W. Short, LIFE LEGAL DEFENSE FOUNDATION, Ojai, California, for Amici Breast Cancer Prevention Institute and Life Legal Defense Foundation. Richard P. Hutchison, LANDMARK LEGAL FOUNDATION, Kansas City, Missouri; Mark R. Levin, Michael J. O'Neill, Matthew C. Forys, LANDMARK LEGAL FOUNDATION, Leesburg, Virginia, for Amicus Landmark Legal Foundation. Stephen B. Presser, Raoul Berger Professor of Legal History, NORTHWESTERN UNIVERSITY SCHOOL OF LAW, Chicago, Illinois; Kathleen Cassidy Goodman, LAW OFFICE OF KATHLEEN CASSIDY GOODMAN, Helotes, Texas; Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia; Allen E. Parker, R. Clayton Trotter, THE JUSTICE FOUNDATION, San Antonio, Texas, for Amicus Project Liberty. David Boyle, Long Beach, California, for Amicus David Boyle. Nikolas T. Nikas, Dorinda C. Bordlee, BIOETHICS DEFENSE FUND, Scottsdale, Arizona, for Amici 281 Members of Legatus and Catholic Medical Association. John A. Eidsmoe, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, for Amicus Foundation for Moral Law. M. Casey Mattox, Michael J. Norton, Steven H. Aden, ALLIANCE DEFENDING FREEDOM, Washington, D.C.; Anna R. Franzonello, Mailee Smith, AMERICANS UNITED FOR LIFE, Washington, D.C., for Amici The Virginia Family Foundation, West Virginia Family Policy Council, Maryland Family Alliance, North Carolina Family Policy Council, Palmetto Family Council, Americans United for Life and Alliance Defending Freedom. Rebecca Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, Richmond, Virginia; Daniel Mach, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington D.C.; Andrew D. Beck, Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici The American Civil Liberties Union, The American Civil Liberties Union of Virginia, Americans United for Separation of Church and State, The Anti-Defamation League, The Interfaith Alliance Foundation, The National Coalition of American Nuns, The National Council of Jewish Women, The Religious Coalition for Reproductive Choice, The Religious Institute, The Unitarian Universalist Association, and The Unitarian Universalist Women's Federation. Ian Millhiser, CENTER FOR AMERICAN PROGRESS, Washington, D.C., for Amici American Nurses Association, American Academy of Pediatrics, American Medical Student Association, Center for American Progress D/B/A Doctors for America, National Hispanic Medical Association, and National Physicians Alliance. Professor Walter Dellinger, Washington, D.C.; Professor H. Jefferson Powell, GEORGE WASHINGTON UNIVERSITY LAW SCHOOL, Washington, D.C., for Amici Senate Majority Leader Harry Reid, House Democratic Leader Nancy Pelosi, and Congressional Leaders and Leaders of Committees of Relevant Jurisdiction. Gillian E. Metzger, Trevor

6

W. Morrison, New York, New York; Andrew J. Pincus, Charles A. Rothfeld, Paul W. Hughes, Michael B. Kimberly, MAYER BROWN LLP, Washington, D.C., for Amici Constitutional Law Professors. Rochelle Bobroff, Simon Lazarus, NATIONAL SENIOR CITIZENS LAW CENTER, Washington, D.C., for Amici The American Association of People with Disabilities, The Arc of the United States, Breast Cancer Action, Families USA, Friends of Cancer Research, March of Dimes Foundation, Mental Health America, National Breast Cancer Coalition, National Organization for Rare Disorders, National Partnership for Women And Families, National Senior Citizens Law Center, National Women's Health Network, and The Ovarian Cancer National Alliance. Sheree R. Kanner, Catherine E. Stetson, Dominic F. Perella, Michael D. Kass, Sara A. Kraner, HOGAN LOVELLS US LLP, Washington, D.C.; Melinda Reid Hatton, Maureen D. Mudron, AMERICAN HOSPITAL ASSOCIATION, Washington, D.C.; Ivy Baer, Karen Fisher, ASSOCIATION OF AMERICAN MEDICAL COLLEGES, Washington, D.C.; Jeffrey G. Micklos, FEDERATION OF AMERICAN HOSPITALS, Washington, D.C.; Larry S. Gage, President, NATIONAL ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS, Washington, D.C.; Lisa Gilden, Vice President, General Counsel/Compliance Officer, THE CATHOLIC HEALTH ASSOCIATION OF THE UNITED STATES, Washington, D.C.; Lawrence A. McAndrews, President and Chief Executive Officer, NATIONAL ASSOCIATION OF CHILDREN'S HOSPITALS, Washington, D.C., for Amici American Hospital Association, Association of American Medical Colleges, Catholic Health Association of the United States, Federation of American Hospitals, National Association of Children's Hospitals, and National Association of Public Hospitals and Health Systems. Kristin Houser, Adam Berger, Rebecca J. Roe, William Rutzick, SCHROETER, GOLDMARK & BENDER, Seattle, Washington, for Amicus The Governor of Washington. Richard L. Rosen, ARNOLD & PORTER LLP, Washington, D.C., for Amici Economic Scholars. Marcia D. Greenberger, Emily J. Martin, Judith G. Waxman, Lisa Codispoti, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Melissa Hart, UNIVERSITY OF COLORADO LAW SCHOOL, Boulder, Colorado, for Amici The National Women's Law Center, American Association of University Women, American Federation of State, County and Municipal Employees, American Medical Women's Association, Asian & Pacific Islander American Health Forum, Black Women's Health Imperative, Childbirth Connection, Ibis Reproductive Health, Institute of Science and Human Values, Maryland Women's Coalition for Health Care Reform, Mental Health America, National Asian Pacific American Women's Forum, National Association of Social Workers, National Coalition for LGBT Health, National Council of Jewish Women, National Council of Women's Organizations, National Education Association, National Latina Institute for Reproductive Health, Older Women's League,

Physicians for Reproductive Choice and Health, Raising Women's Voices, Sargent Shriver National Center on Poverty Law, Southwest Women's Law Center, Wider Opportunities for Women, Women's Law Center of Maryland, Incorporated, and Women's Law Project.  B. Robert Piller, Jennifer Blasdell, PHYSICIANS FOR REPRODUCTIVE HEALTH, New York, New York; Bruce H. Schneider, Michele L. Pahmer, STROOCK & STROOCK & LAVAN LLP, New York, New York, for Amici Physicians for Reproductive Health, American College of Obstetricians and Gynecologists, American Society for Emergency Contraception, Association of Reproductive Health Professionals, American Society for Reproductive Medicine, Society for Adolescent Health and Medicine, American Medical Women's Association, National Association of Nurse Practitioners in Women's Health, Society of Family Planning, James Trussell, Susan F. Wood, Don Downing, and Kathleen Besinque.

_____

MOTZ, DAVIS, and WYNN, Circuit Judges:

Liberty University and certain individuals (collectively, "Plaintiffs") brought this action challenging two provisions of the Patient Protection and Affordable Care Act: the "individual mandate," which requires individuals to purchase a minimum level of health insurance coverage, and the "employer mandate," which requires certain employers to offer such coverage to their employees and their dependents. The district court dismissed the lawsuit, upholding the constitutionality of both mandates. On appeal we held that the Anti-Injunction Act barred us from considering Plaintiffs' claims and remanded the case to the district court with instructions to dismiss for lack of jurisdiction. See Liberty Univ., Inc. v. Geithner, 671 F.3d 391 (4th Cir. 2011). The Supreme Court granted Plaintiffs' petition for certiorari, vacated our judgment, and remanded for further consideration in light of National Federation of Independent Business v. Sebelius, 132 S. Ct. 2566 (2012) ("NFIB"). See Liberty Univ. v. Geithner, 133 S. Ct. 679 (2012). After careful consideration of that case, we affirm the judgment of the district court.

I.

On March 23, 2010, President Obama signed the Patient Protection and Affordable Care Act ("Affordable Care Act" or

9

"the Act") into law. See Pub. L. No. 111-148, 124 Stat. 119 (2010). Liberty and two unaffiliated individuals challenge the individual mandate, which will become effective in 2014, and the employer mandate, which will become effective in 2015. Before resolving the legal questions, we summarize the requirements of the mandates and the relevant facts and procedural history of this case.

A.

1.

With limited exceptions, the individual mandate imposes a "penalty" on any taxpayer who is an "applicable individual" and fails to obtain "minimum essential coverage." 26 U.S.C. § 5000A(a)-(b). "Minimum essential coverage" includes coverage under various government-sponsored programs, an employer-sponsored plan, or a health plan offered in the individual market within a state, as well as certain other coverage. Id. § 5000A(f).

Any individual who does not qualify for a listed exemption is an "applicable individual." Id. § 5000A(d)(1). The Act provides two religion-based exemptions. The "[r]eligious conscience exemption" applies to an individual who is "a member of a recognized religious sect or division thereof," id. § 5000A(d)(2)(A), and "an adherent of established tenets or teachings of such sect or division by reason of which he is

10

conscientiously opposed to acceptance of the benefits of any [life, disability, old-age, retirement, or medical] insurance," id. § 1402(g)(1).  The sect must have been in existence at all times since December 31, 1950, and must "make provision for [its] dependent members."  Id.  The "[h]ealth care sharing ministry" exemption applies to a member of a 501(c)(3) organization that "has been in existence at all times since December 31, 1999," the "members of which share a common set of ethical or religious beliefs[,] . . . share medical expenses among members in accordance with those beliefs," and "retain membership even after they develop a medical condition."  Id. § 5000A(d)(2)(B).

The penalty for failing to obtain minimum essential coverage is tied to the individual's income but cannot exceed the cost of "the national average premium for qualified health plans" meeting a certain level of coverage.  See id. § 5000A(c). The Secretary of the Treasury has the authority to "assess[] and collect[] [the penalty] in the same manner" as a tax.  Id. §§ 5000A(g)(1), 6671(a).

2.

If an "applicable large employer" fails to provide affordable health care coverage to its full-time employees and their dependents, the employer mandate may require an "assessable payment" by the employer.  Id. § 4980H(a)-(b).  The

11

Act defines an "applicable large employer" as an employer who employed an average of at least fifty full-time employees during the preceding year. Id. § 4980H(c)(2).

Such an employer must make an assessable payment if at least one of its full-time employees qualifies for "an applicable premium tax credit or cost-sharing reduction" to help pay for health care coverage. Id. § 4980H(a)-(b). An employee is eligible for an "applicable premium tax credit" or "cost-sharing reduction" if the employer fails to offer the employee "affordable" coverage providing "minimum value" and the employee's income falls between 100% and 400% of the poverty line. Id. §§ 4980H(c)(3), 36B(a)-(c); Affordable Care Act § 1402(a), (b), (f)(2) (codified at 42 U.S.C. § 18071(a), (b), (f)(2)).[1]

The amount of the assessable payment that an employer required to make such a payment must pay depends on whether the employer offers "minimum essential coverage" to its full-time employees and their dependents. 26 U.S.C. § 4980H(a)-(b). If the employer fails to offer such coverage, the assessable

---

[1] Coverage is "affordable" if the employee's required contribution to the plan does not exceed an indexed percentage of his household income. 26 U.S.C. § 36B(c)(2)(C)(i). A plan fails to provide "minimum value" if the plan's share of the employee's health costs is less than 60% of total costs. Id. § 36B(c)(2)(C)(ii).

payment is calculated by multiplying $2000 by the number of full-time employees (less thirty), prorated over the number of months the employer is liable. Id. § 4980H(a), (c)(1), (c)(2)(D)(i). If the employer does offer such coverage, the assessable payment is calculated by multiplying $3000 by the number of employees receiving an applicable premium tax credit or cost-sharing reduction, prorated on a monthly basis. Id. § 4980H(b)(1). The amount of the payment under § 4980H(b) cannot exceed the amount the employer would owe if liable under § 4980H(a). Id. § 4980H(b)(2). As with the individual mandate, the Secretary of the Treasury has the authority to assess and collect the exaction in the same manner as a tax. Id. §§ 4980H(d)(1), 6671(a).

"Minimum essential coverage" includes coverage under an "eligible employer-sponsored plan," other than coverage of only certain excepted benefits (like limited scope dental or vision benefits), which does not qualify. Id. §§ 4980H(a)(1), 5000A(f)(2)-(3); Public Health Service Act § 2791(c) (codified at 42 U.S.C. § 300gg-91(c)). An "eligible employer-sponsored plan" includes a "group health plan," which is a plan established or maintained by an employer for the purpose of providing medical care to employees and their dependents. 26 U.S.C. § 5000A(f)(2); 42 U.S.C. § 300gg-91(a); 29 U.S.C. § 1002(1). Thus, employer-provided health care coverage would

13

seem to qualify as minimum essential coverage unless that coverage applies only to excepted benefits. In effect, then, § 4980H(a) imposes an assessable payment on an applicable employer who fails to offer coverage to its full-time employees and their dependents, while § 4980H(b) imposes an assessable payment on an applicable employer who provides coverage that does not satisfy the mandate's affordability criteria.

B.

On March 23, 2010, the day the President signed the Affordable Care Act into law, Plaintiffs filed this action against the Secretary of the Treasury and other officials (collectively, "the Secretary"). Plaintiffs sought a declaration that the individual and employer mandates are invalid and an order enjoining their enforcement.

1.

In their second amended complaint, the individual plaintiffs, Michele G. Waddell and Joanne V. Merrill, assert that they have "made a personal choice not to purchase health insurance coverage and [do] not want to" do so.[2] Further, Waddell and Merrill allege that the Act will force them to "pay

---

[2] The district court found that three of the individual plaintiffs, David Stein, Kathy Byron, and Jeff Helgeson, lacked standing. Liberty Univ., Inc. v. Geithner, 753 F. Supp. 2d 611, 621-22 (W.D. Va. 2010). Plaintiffs do not challenge that determination on appeal.

14

for health insurance coverage that is not necessary or desirable or face significant penalties." They also assert that they are Christians "who have sincerely held religious beliefs that abortions, except where necessary to save the life of the pregnant mother, are murder and morally repugnant" and that "they should play no part in such abortions, including no part in facilitating, subsidizing, easing, funding, or supporting such abortions since to do so is evil and morally repugnant complicity."

Liberty alleges that it employs approximately 3900 full-time faculty and staff, and that it is self-insured and offers "health savings accounts, private insurance policies and other health care reimbursement options to qualified employees." Liberty asserts that "depending upon how the federal government defines 'minimum essential coverage' and the affordability index," the University could be found to offer coverage insufficient "to satisfy the federal definition of minimum essential coverage or coverage that is deemed unaffordable . . . and therefore could be subjected to significant penalties" and "substantial financial hardship." Liberty also alleges that the employer mandate will "increase the cost of care . . . [and] will directly and negatively affect [the University] by increasing the cost of providing health insurance coverage and

15

thus directly affect the ability of the University to carry on its mission."

Finally, Liberty asserts that it "is a Christian educational institution whose employees are Christians who have sincerely held religious beliefs that abortions, except where necessary to save the life of the pregnant mother, are murder and morally repugnant." It further explains that its religious beliefs bar it from "play[ing] [any] part in abortions, including [any] part in facilitating, subsidizing, easing, funding, or supporting abortions since to do so is evil and morally repugnant complicity."

2.

Before the district court, Plaintiffs asserted that the individual and employer mandates exceeded Congress's Article I powers and violated the Tenth Amendment, the Establishment and Free Exercise Clauses of the First Amendment, the Religious Freedom Restoration Act, the Fifth Amendment, the right to free speech and free association under the First Amendment, the Article I, Section 9 prohibition against unapportioned capitation or direct taxes, and the Guarantee Clause. The Secretary moved to dismiss the second amended complaint for lack of jurisdiction, arguing that Plaintiffs lacked standing and that the Anti-Injunction Act barred the suit. Alternatively, the Secretary moved to dismiss all counts for failure to state a

16

claim upon which relief could be granted. The district court concluded that it possessed jurisdiction but granted the Secretary's motion to dismiss for failure to state a claim. See Liberty Univ., Inc. v. Geithner, 753 F. Supp. 2d 611 (W.D. Va. 2010). Plaintiffs appealed only as to the Article I, Establishment Clause, Free Exercise Clause, Religious Freedom Restoration Act, and Fifth Amendment claims.

When we considered the case on appeal, we did not reach the merits of those claims because we concluded that the Anti-Injunction Act deprived us of jurisdiction. See Liberty Univ., 671 F.3d 391. After initially denying certiorari, Liberty Univ. v. Geithner, 133 S. Ct. 60 (2012), on reconsideration the Supreme Court granted certiorari, vacated our judgment, and directed us to give further consideration to the case in light of NFIB, see Liberty Univ., 133 S. Ct. 679. In NFIB, the Court held that the Anti-Injunction Act did not bar a challenge to the individual mandate and upheld that mandate as a lawful exercise of Congress's taxing power. 132 S. Ct. at 2584, 2600. Five members of the Court, however, concluded that the individual mandate exceeds Congress's power under the Commerce Clause. Id. at 2593 (Roberts, C.J.); id. at 2644-50 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("joint dissent").

On remand, we must decide whether the Anti-Injunction Act bars this pre-enforcement challenge to the employer mandate, and

17

whether Plaintiffs have standing to challenge the mandates. If neither jurisdictional hurdle prevents our consideration of the merits of the case, we must determine whether Congress acted within the scope of its constitutionally delegated powers when it enacted the employer mandate. Finally, if we find that the mandates are a valid exercise of Congress's Article I powers, we must address Plaintiffs' religion-based arguments.[3] Our review is de novo. E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (reviewing de novo district court's grant of motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)); Estate of Michael ex rel. Michael v. Lullo, 173 F.3d 503, 506 (4th Cir. 1999) (reviewing de novo district court's decision whether to dismiss for lack of jurisdiction).

II.

The Anti-Injunction Act ("AIA") provides that "no suit for the purpose of restraining the assessment or collection of any

---

[3] The plaintiffs raise on appeal new arguments that the Affordable Care Act violates the Origination Clause and impermissibly conflicts with various state laws. Plaintiffs had the opportunity to raise these arguments in the district court and in the original briefing in this case but did not do so; thus the arguments are waived. See Wash. Metro. Area Transit Auth. v. Precision Small Engines, 227 F.3d 224, 227-28 (4th Cir. 2000).

tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). Where it applies, the AIA thus deprives courts of jurisdiction to entertain pre-enforcement suits seeking to enjoin the collection of federal taxes. See Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 5 (1962).[4]

Liberty's challenge to the employer mandate is a pre-enforcement suit to enjoin the collection of an exaction that is codified in the Internal Revenue Code, and which the Secretary of the Treasury is empowered to collect in the same manner as a tax. In NFIB, however, the Supreme Court made clear that the AIA does not apply to every exaction that functions as a tax or even to every exaction that passes muster as a tax for constitutional purposes. Rather, the AIA applies only where Congress intends it to. See NFIB, 132 S. Ct. at 2583 (noting that, although "Congress cannot change whether an exaction is a tax . . . for constitutional purposes," the AIA and the Affordable Care Act "are creatures of Congress's own creation" and "[h]ow they relate to each other is up to Congress").

---

[4] We note that Plaintiffs request declaratory as well as injunctive relief. The Declaratory Judgment Act authorizes federal courts to issue declaratory judgments, except "with respect to Federal taxes." 28 U.S.C. § 2201(a). Because the Declaratory Judgment Act's tax exception is coextensive with the AIA, the following analysis also applies to Plaintiffs' request for declaratory relief. See Sigmon Coal Co. v. Apfel, 226 F.3d 291, 299 (4th Cir. 2000).

When concluding that Congress did not intend to bar pre-enforcement challenges to the individual mandate, the Court in NFIB found it most significant that Congress chose to describe the shared responsibility payment as a "penalty" rather than a "tax." See id. (noting that "[t]here is no immediate reason to think that a statute applying to 'any tax' would apply to a 'penalty'"). Thus, we begin our AIA inquiry with particular attention to how Congress characterized the exaction set forth in the employer mandate.

In maintaining that the AIA bars this challenge to the employer mandate, the Secretary relies heavily on the fact that the Act twice refers to the employer mandate exaction as a "tax." See 26 U.S.C. § 4980H(b)(2), (c)(7). In doing so, the Secretary virtually ignores the fact that the Act does not consistently characterize the exaction as a tax. Rather, the Act initially identifies the employer mandate exaction as an "assessable payment." See id. § 4980H(a). The Act then proceeds to characterize the exaction as an "assessable payment" six more times. See id. § 4980H(b)(1), (c)(2)(D)(i)(I), (d)(1), (d)(2), (d)(3). Additionally, the Act once refers to the exaction as an "assessable penalt[y]." See id. § 4980H(c)(2)(D).

Further, on one of the two occasions in which the Act refers to the employer mandate exaction as a "tax," it does so

20

in a tax-specific context, where the use of another word would create confusion. Section 4980H(c)(7) provides: "For denial of deduction for the tax imposed by this section, see section 275(a)(6)." Section 275(a) states that "[n]o deduction shall be allowed for the following taxes" and then lists various taxes, including "[t]axes imposed by chapter[] . . . 43." The employer mandate is codified in chapter 43 of the Code. Thus, the Act presumably refers to the employer mandate exaction as a "tax" when cross-referencing § 275(a)(6) to make clear that, for purposes of determining deductibility, the exaction is a tax imposed by chapter 43.

There may be no equally obvious explanation for the other instance in which the Act characterizes the employer mandate exaction as a "tax." See 26 U.S.C. § 4980H(b)(2) (providing that the "aggregate amount of tax" assessed for offering coverage that is unaffordable cannot exceed the amount the employer would owe under section 4980H(a) for failing to offer minimum essential coverage). But we simply cannot place much significance on a single unexplained use of that term. Because Congress initially and primarily refers to the exaction as an "assessable payment" and not a "tax," the statutory text suggests that Congress did not intend the exaction to be treated as a tax for purposes of the AIA.

21

Furthermore, Congress did not otherwise indicate that the employer mandate exaction qualifies as a tax for AIA purposes, though of course it could have done so. As the Supreme Court pointed out in NFIB, 26 U.S.C. § 6671(a) provides that the "penalties and liabilities" found in subchapter 68B of the Internal Revenue Code are "treated as taxes" for purposes of the AIA. See NFIB, 132 S. Ct. at 2583. The employer mandate, like the individual mandate, is not included in subchapter 68B, and no other provision indicates that we are to treat its "assessable payment" as a tax. See id. (making the same point with regard to the individual mandate).

Finally, we note that to adopt the Secretary's position would lead to an anomalous result. The Supreme Court has expressly held that a person subject to the individual mandate can bring a pre-enforcement suit challenging that provision. But, under the Secretary's theory, an employer subject to the employer mandate could bring only a post-enforcement suit challenging that provision. It seems highly unlikely that Congress meant to signal -- with two isolated references to the term "tax" -- that the mandates should be treated differently for purposes of the AIA's applicability. Tellingly, the Government has pointed to no rationale supporting such differential treatment.

22

For these reasons, we hold that the employer mandate exaction, like the individual mandate exaction, does not constitute a tax for purposes of the AIA.  Therefore, the AIA does not bar this suit.

III.

The Secretary argues that another jurisdictional hurdle -- standing -- prevents our consideration of the merits of this case.  To establish standing at the motion to dismiss stage, a plaintiff must plausibly allege that:  "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (internal quotation marks omitted); see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (at motion to dismiss stage, plaintiff must allege sufficient facts to render claim plausible).  The Secretary contends that all plaintiffs lack standing because they allege no actual or imminent injury.  We address first Liberty's standing and then that of the individual plaintiffs.

23

A.

Liberty has more than fifty full-time employees, and the Secretary does not contest that it is an "applicable large employer" subject to the employer mandate. Nevertheless, the Secretary argues that Liberty has failed to establish standing because it is speculative whether Liberty will be subject to an assessable payment under 26 U.S.C. § 4980H. Specifically, the Secretary contends that the health care coverage Liberty acknowledges it already provides to its employees qualifies as minimum essential coverage that may also satisfy the employer mandate's affordability criteria.

The Secretary's argument may well be correct -- as far as it goes.[5] But Liberty need not show that it will be subject to an assessable payment to establish standing if it otherwise

---

[5] Liberty alleges that it "could be determined to not offer coverage sufficient to satisfy the federal definition of minimum essential coverage or coverage that is deemed unaffordable . . . and therefore could be subjected to significant penalties." But "minimum essential coverage" seems to include coverage under any employer-sponsored plan, unless that plan covers only excepted benefits. See 26 U.S.C. §§ 4980H(a), 5000A(f)(2)-(3). Liberty does not suggest its current plan covers only excepted benefits. Thus, by definition that plan appears to meet the "minimum essential coverage" requirement. Further, while it is possible that Liberty's current plan fails to provide affordable coverage, subjecting Liberty to an assessable payment under § 4980H(b), Liberty alleges only that its coverage "could" be deemed unaffordable. The Supreme Court has held that "threatened injury must be certainly impending to constitute injury in fact" and "[a]llegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks omitted).

24

alleges facts that establish standing. In this case, in addition to alleging that it "could" be subject to an assessable payment, Liberty alleges that the employer mandate and its "attendant burdensome regulations will . . . increase the cost of care" and "directly and negatively affect [it] by increasing the cost of providing health insurance coverage."

"[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal quotation marks omitted); see Bennett v. Spear, 520 U.S. 154, 167-68 (1997). Thus, to establish standing, Liberty need not prove that the employer mandate will increase its costs of providing health coverage; it need only plausibly allege that it will.

Liberty's allegation to this effect is plausible. Even if the coverage Liberty currently provides ultimately proves sufficient, it may well incur additional costs because of the administrative burden of assuring compliance with the employer mandate, or due to an increase in the cost of care. See generally Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 457-58 (D.C. Cir. 2012) (increased compliance costs constitute injury in fact sufficient to confer standing); N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d Cir.

25

2008) (administrative burden constitutes injury in fact for standing purposes); Frank v. United States, 78 F.3d 815, 823-24 (2d Cir. 1996) (same), vacated on other grounds, 521 U.S. 1114 (1997).

Moreover, Liberty's injury is imminent even though the employer mandate will not go into effect until January 1, 2015, as Liberty must take measures to ensure compliance in advance of that date. See Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392-93 (1988) (holding booksellers had standing though challenged law had not yet been enforced because they "w[ould] have to take significant and costly compliance measures" beforehand "if their interpretation of the statute [wa]s correct"). Thus, Liberty has standing to challenge the employer mandate.

B.

The individual plaintiffs, after alleging that they do not have or want to purchase health insurance coverage, assert that the individual mandate "will create a financial hardship in that [they] will have to either pay for health insurance coverage . . . or face significant penalties."

The Secretary maintains that the individual plaintiffs lack standing because they may be exempt from the individual mandate penalty, either because their income is below the mandate's threshold level or because they qualify for a proposed hardship

26

exemption.  See 26 U.S.C. § 5000A(e)(2) (exempting individuals with income below filing threshold); 78 Fed. Reg. 7348, 7354-55 (Feb. 1, 2013) (describing proposed hardship exemptions).  But, again, at this early stage, plaintiffs need only provide "general factual allegations of injury."  Lujan, 504 U.S. at 561.  And, we must "accept[] all well-pleaded allegations in the plaintiff's complaint as true."  De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003).

The individual plaintiffs allege the individual mandate will obligate them to buy insurance or pay a penalty, and their alleged lack of insurance provides sufficient support for that allegation at this stage of the proceedings.  Further, the individual plaintiffs' injury is imminent because they must make preparations to obtain insurance before the mandate goes into effect.  See Am. Booksellers Ass'n, 484 U.S. at 392-93.

Thus, we conclude that the individual plaintiffs have standing to challenge the individual mandate.  We therefore proceed to the merits.

IV.

A.

Liberty argues that the employer mandate exceeds Congress's commerce power because Congress does not have "the power to order employers to provide government-defined health insurance

27

to their employees." Post-Remand Opening Br. 18. This is so, Liberty contends, because the employer mandate "compel[s] employers to engage in particular conduct or purchase an unwanted product," contrary to the dictates of NFIB. Post-Remand Reply Br. 16. In Liberty's view, "[a]llowing Congress to mandate that employers provide health insurance . . . goes far beyond regulations of wages and hours upheld under the Commerce Clause." Post-Remand Opening Br. 19.

The Secretary counters that the employer mandate is a valid exercise of Congress's authority under the Commerce Clause because "[h]ealth coverage benefits form part of an employee's compensation package, and 'it is well-established in Supreme Court precedent that Congress has the power to regulate the terms and conditions of employment.'" Post-Remand Resp. Br. 25. (quoting Liberty Univ., 753 F. Supp. 2d at 635). More specifically, the Secretary argues that

> [i]f employees put their insurance at risk when they change jobs, they may be "reluctant to switch jobs in the first place (a phenomenon known as 'job lock')." [Congressional Budget Office, Key Issues in Analyzing Major Health Insurance Proposals 8 (Dec. 2008) [hereinafter "CBO, Key Issues"]]. As Congress understood, the prospect of losing employee insurance benefits may obstruct interstate mobility, which the Constitution generally, and the commerce power specifically, were designed to prevent.

Original Resp. Br. 46–47. The Secretary further contends that

> Congress found that "employers who do not offer health insurance to their workers gain an unfair economic

28

> advantage relative to those employers who do provide coverage, and millions of hard-working Americans and their families are left without health insurance." H.R. Rep. No. 111-443(II), at 985 (2010). Congress noted that this state of affairs results in "a vicious cycle because these uninsured workers turn to emergency rooms for health care which in turn increases costs for employers and families with health insurance," making it more difficult for employers to provide coverage. Id. at 985–86.

Id. at 53. Thus, the Secretary concludes, "[t]he provision of health coverage substantially affects commerce just as other forms of compensation and terms of employment do, and the businesses run by large employers likewise substantially affect commerce." Post-Remand Resp. Br. 27–28. We think the Secretary has the better argument.

B.

"[T]he determinative test of the exercise of power by the Congress under the Commerce Clause is simply whether the activity sought to be regulated is commerce which concerns more States than one and has a real and substantial relation to the national interest." Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 255 (1964) (internal quotation marks omitted). "The power of Congress in this field is broad and sweeping . . . ." Katzenbach v. McClung, 379 U.S. 294, 305 (1964); see also NFIB, 132 S. Ct. at 2585 (Roberts, C.J.) ("[I]t is now well established that Congress has broad authority under the [Commerce] Clause."). "[T]he power to regulate commerce is

29

the power to enact all appropriate legislation for its protection or advancement; to adopt measures to promote its growth and insure its safety; to foster, protect, control, and restrain." NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 36–37 (1937) (internal citations and quotation marks omitted).

Among Congress's expansive Commerce Clause powers is the authority to regulate "those activities that substantially affect interstate commerce." United States v. Morrison, 529 U.S. 598, 609 (2000). So broad is this power that Congress may regulate activity without showing that it has "any specific effect upon interstate commerce," so long as, "in the aggregate," the activity "would represent 'a general practice . . . subject to federal control.'" Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56-57 (2003) (ellipsis in original) (quoting Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 236 (1948)). Moreover, Congress need not show that the activity "taken in the aggregate, substantially affect[s] interstate commerce in fact," but only that "a 'rational basis' exists for so concluding." Gonzales v. Raich, 545 U.S. 1, 22 (2005) (emphasis added) (quoting United States v. Lopez, 514 U.S. 549, 557 (1995)).

To be sure, Congress's authority under the Commerce Clause is not without limits. In NFIB, five justices of the Supreme Court found that the individual mandate exceeded Congress's

commerce power. 132 S. Ct. at 2585–93 (Roberts, C.J.); id. at 2644–50 (joint dissent). Although "[t]here has been considerable debate about whether the statements [in NFIB] about the Commerce Clause are dicta or binding precedent,"[6] these five justices agreed that the Commerce Clause does not grant Congress the authority to "compel" or "mandate" an individual to enter commerce by purchasing a good or service. See NFIB, 132 S. Ct. at 2587 (Roberts, C.J.) (finding the individual mandate beyond Congress's commerce power because it "compels individuals to become active in commerce by purchasing a product") (emphasis in original); id. at 2646–47 (joint dissent) (noting that "mandating of economic activity" is beyond the scope of the Commerce Clause). Rather, these justices concluded that the Commerce Clause permits Congress to regulate only existing activity.

Chief Justice Roberts's -- and, to a large degree, the joint dissenters' -- analysis focused on the text of the Commerce Clause, the Court's cases interpreting that clause, and

---

[6] United States v. Henry, 688 F.3d 637, 641 n.5 (9th Cir. 2012) (citing David Post, Commerce Clause "Holding v. Dictum Mess" Not So Simple, The Volokh Conspiracy (July 3, 2012, 8:17 AM), http://www.volokh.com/2012/07/03/commerce-clause-holding-v-dictum-mess-not-so-simple/), cert. denied, 133 S. Ct. 996 (2013); see also United States v. Roszkowski, 700 F.3d 50, 58 n.3 (1st Cir. 2012) (declining to "express [an] opinion as to whether the . . . Commerce Clause discussion was indeed a holding of the Court").

the practical effect and operation of the individual mandate. As to the text, Chief Justice Roberts noted that the Commerce Clause "grants Congress the power to 'regulate Commerce.'" Id. at 2586 (emphasis in original) (citing U.S. Const. art. I, § 8, cl. 3). In the Chief Justice's view, "[t]he power to regulate commerce presupposes the existence of commercial activity to be regulated." Id. (emphasis in original). In the same vein, the joint dissenters cited definitions of "regulate" common at the time of the Constitution's drafting, and concluded that under these definitions "regulate" "can mean to direct the manner of something but not to direct that something come into being." Id. at 2644.

As to the Court's prior cases, the Chief Justice noted that "all have one thing in common: They uniformly describe the power as reaching 'activity.'" Id. at 2587; see also id. (citing Lopez, 514 U.S. at 560; Perez v. United States, 402 U.S. 146, 154 (1971); Wickard v. Filburn, 317 U.S. 111, 125 (1942); NLRB, 301 U.S. at 37). The joint dissenters similarly distinguished the Commerce Clause cases on which the government relied as "involv[ing] commercial activity," id. at 2648 (emphasis in original), and "not represent[ing] the expansion of the federal power to direct into a broad new field," id. at 2646.

32

Finally, both Chief Justice Roberts and the joint dissenters expressed substantial concern about the practical and operational effects of the individual mandate. Chief Justice Roberts suggested that construing the commerce power to allow Congress to mandate the purchase of health insurance would "permit Congress to regulate individuals precisely <u>because</u> they are doing nothing," and "would bring countless decisions an individual could <u>potentially</u> make within the scope of federal regulation . . . ." <u>Id.</u> at 2587 (emphasis in original). The joint dissenters expressed a similar concern, stating that

> [i]f Congress can reach out and command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power, or in Hamilton's words, "the hideous monster whose devouring jaws . . . spare neither sex nor age, nor high nor low, nor sacred nor profane."

<u>Id.</u> at 2646 (ellipsis in original) (citing The Federalist No. 33, at 202 (Clinton Rossiter ed., 1961)).

C.

For the reasons set forth within, we find that the employer mandate is no monster; rather, it is simply another example of Congress's longstanding authority to regulate employee compensation offered and paid for by employers in interstate commerce. To begin, we note that unlike the individual mandate (as construed by five justices in <u>NFIB</u>), the employer mandate does not seek to create commerce in order to regulate it. In

33

contrast to individuals, all employers are, by their very nature, engaged in economic activity. All employers are in the market for labor. And to the extent that the employer mandate compels employers in interstate commerce to do something, it does not compel them to "become active in commerce," NFIB, 132 S. Ct. at 2587 (Roberts, C.J.) (emphasis in original); it merely "regulate[s] existing commercial activity," id., i.e., the compensation of employees, see Congressional Budget Office, CBO, Key Issues 5 (observing that "[e]mployers' contributions [to health insurance coverage] are simply a form of [employee] compensation"). Liberty fails to recognize the distinction between individuals not otherwise engaged in commerce and employers necessarily so engaged.

Further, contrary to Liberty's assertion, the employer mandate does not require employers to "purchase an unwanted product." Post-Remand Reply Br. 16. Although some employers may have to increase employee compensation (by offering new or modified health insurance coverage), employers are free to self-insure, and many do. See 78 Fed. Reg. 7314, 7318 (Feb. 1, 2013) (confirming that a self-insured group health plan is an eligible employer-sponsored plan satisfying the Act's "minimum essential coverage" requirement); Paul Fronstin, "Self-Insured Health Plans: State Variation and Recent Trends by Firm Size," Notes (Employee Benefit Research Inst.), Nov. 2012, at 2 ("In 2011,

34

68.5 percent of workers in firms with 50 or more employees were in self-insured plans . . . .").[7]

Having found that the provision regulates existing economic activity (employee compensation), and therefore stands on quite a different footing from the individual mandate, we further conclude that the employer mandate is a valid exercise of Congress's authority under the Commerce Clause. It has long been settled that Congress may impose conditions on terms of employment that substantially affect interstate commerce, see United States v. Darby, 312 U.S. 100 (1941) (upholding minimum wage and overtime provisions of the Fair Labor Standards Act); NLRB, 301 U.S. 1 (upholding National Labor Relations Act of 1935, which prohibited unfair labor practices), and regulate activities that have a substantial impact on interstate mobility, see Heart of Atlanta Motel, Inc., 379 U.S. 241 (prohibiting discrimination by hotel operators); Katzenbach, 379 U.S. 294 (prohibiting discrimination by restaurant owners). Here, Congress did both.

First, the employer mandate regulates a term of employment (compensation) that substantially affects interstate commerce.

---

[7] We express no opinion as to whether the limitation on the commerce power announced by five justices in NFIB constitutes a holding of the Court. Rather, we assume without deciding that it does, and conclude that the employer mandate is not restricted by that limitation.

Health insurance provided as part of employees' compensation "is the primary source of coverage for the nonelderly," CBO, Key Issues 4, and "[h]ealth insurance and health care services are a significant part of the national economy," 42 U.S.C. § 18091(2)(B).

> National health spending is projected to increase from [$2.5 trillion], or 17.6 percent of the economy, in 2009 to [$4.7 trillion] in 2019. Private health insurance spending is projected to be [$854 billion] in 2009, and pays for medical supplies, drugs, and equipment that are shipped in interstate commerce.

Id. "[E]mployers who do not offer health insurance to their workers gain an unfair economic advantage relative to those employers who do provide coverage," and perpetuate a "vicious cycle," H.R. Rep. No. 111-443(II), at 985 (2010): "uninsured workers turn to emergency rooms for health care" they cannot afford, id.; "health care providers pass on the cost [of the uncompensated care] to private insurers," 42 U.S.C. § 18091(2)(F); and insurers "pass on the cost to families" through premium increases, id., making it more expensive -- and thus, more difficult -- for employers to insure their employees. "The cost of providing uncompensated care to the uninsured was [$43 billion] in 2008," id., and "[t]he economy loses up to [$207 billion] a year because of the poorer health and shorter lifespan of the uninsured," id. § 18091(2)(E). Accordingly,

36

health insurance provided as part of employee compensation has a substantial impact on interstate commerce.

Second, the employer mandate regulates an activity (employee compensation) that substantially affects workers' interstate mobility. The availability and breadth of employer-sponsored health coverage varies, see, e.g., CBO, Key Issues 44 (observing that "large employers are more likely than small employers to offer health insurance"), and "[t]he availability of health insurance options can affect people's incentives to enter the labor force, work fewer or more hours, retire, change jobs, or even prefer certain types of firms or jobs," id. at 162. "[E]mployees and their dependents typically have to change plans when changing jobs and could become uninsured if their new employer does not offer coverage," id. at 8; "[e]mployment-based insurance offers a number of advantages," including "lower administrative costs" and "favorable tax treatment" that "may be difficult or impossible for workers to obtain by purchasing insurance individually," id. at 164. And "[p]eople who have medical problems (or have family members with medical problems) can have an incentive to stay in a job that provides health insurance benefits in order to cover those preexisting conditions, even if more productive opportunities exist elsewhere." Id. at 164–65. Thus, health insurance provided as

37

part of employee compensation substantially affects interstate mobility, and thereby interstate commerce.

Our recognition of Congress's authority to enact the employer mandate does not "open a new and potentially vast domain to congressional authority," NFIB, 132 S. Ct. at 2587 (Roberts, C.J.), or "enable the Federal Government to regulate all private conduct," id. at 2643 (joint dissent). Requiring employers to offer their employees a certain level of compensation through health insurance coverage is akin to requiring employers to pay their workers a minimum wage, Darby, 312 U.S. at 115, or "time and a half for overtime," Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 577 (1942). Thus, our conclusion fits squarely within the existing core of the Supreme Court's jurisprudence, including the admonition of five justices in NFIB that Congress may not, through its commerce power, seek to create commerce in order to regulate it.

D.

For all these reasons, we conclude that Congress had a rational basis for finding that employers' provision of health insurance coverage substantially affects interstate commerce, see Raich, 545 U.S. at 22, and Congress's regulation of this activity does not run afoul of NFIB's teachings. Accordingly, we hold that the employer mandate is a valid exercise of Congress's authority under the Commerce Clause.

38

V.

A.

Plaintiffs contend that "[t]he Taxing and Spending or General Welfare Clause does not vest Congress with the authority to enact the [individual and employer] mandates." Original Opening Br. 40. But in NFIB, the Supreme Court held that the individual mandate exaction constituted a tax and that Congress acted well within the scope of its constitutionally granted authority in imposing it. 132 S. Ct. at 2594-2600. Clearly, then, Plaintiffs' contention fails with regard to the individual mandate. And although NFIB did not present the Supreme Court with an opportunity to address the constitutionality of the employer mandate, we are convinced that the NFIB taxing power analysis inevitably leads to the conclusion that the employer mandate exaction, too, is a constitutional tax.

B.

The Constitution unambiguously grants Congress the power to "lay and collect Taxes . . . ." U.S. Const. art. I, § 8, cl. 1. The Supreme Court has defined a tax as a "pecuniary burden laid upon individuals or property for the purpose of supporting the government," United States v. New York, 315 U.S. 510, 515 (1942), and described Congress's taxing power as "very extensive," License Tax Cases, 72 U.S. 462, 471 (1866).

39

In NFIB, the Supreme Court gleaned from precedent a "functional approach" for determining whether an exaction, whatever Congress calls it, constitutes a tax. 132 S. Ct. at 2595. Under that approach, the "essential feature" of any tax is that "it produces at least some revenue for the Government." Id. at 2594. Additional characteristics indicative of a tax include: the absence of a scienter requirement, collection by the Internal Revenue Service through the normal means of taxation, and the absence of negative legal consequences beyond requiring payment to the IRS. Id. at 2595-97. The Supreme Court illustrated its functional approach with a hypothetical:

> Suppose Congress enacted a statute providing that every taxpayer who owns a house without energy efficient windows must pay $50 to the IRS. The amount due is adjusted based on factors such as taxable income and joint filing status, and is paid along with the taxpayer's income tax return. Those whose income is below the filing threshold need not pay. The required payment is not called a "tax," a "penalty," or anything else. No one would doubt that this law imposed a tax, and was within Congress's power to tax. . . . Interpreting such a law to be a tax would hardly "[i]mpos[e] a tax through judicial legislation." Rather, it would give practical effect to the Legislature's enactment.

Id. at 2597-98 (citation omitted).

By contrast, the Supreme Court dismissed as largely irrelevant the "regulatory motive or effect of revenue-raising measures." Id. at 2599. The Court recognized that some of its older cases suggested a dichotomy between regulatory and

40

revenue-raising taxes: "A few of our cases policed the[] limits [of Congress's ability to use its taxing power to influence conduct] aggressively . . . ." Id. (citing United States v. Butler, 297 U.S. 1 (1936); Bailey v. Drexel Furniture Co., 259 U.S. 20 (1922)). But the Court rejected the revenue-versus-regulatory distinction as defunct. Id. Accordingly, that Congress "plainly designed" the Affordable Care Act "to expand health insurance coverage" did not impact the Court's taxing power analysis in NFIB. Id. at 2596. The Court did, however, attempt to distinguish taxes from penalties, explaining that "if the concept of penalty means anything, it means punishment for an unlawful act or omission." Id. (quotation marks omitted).

## C.

First, we examine the factors the Supreme Court considered in upholding the individual mandate exaction as a constitutional tax. In applying its "functional approach" to that exaction, the Supreme Court concluded that it "looks like a tax in many respects." Id. at 2594. First and foremost, it will produce "at least some revenue for the Government" -- namely "about $4 billion per year by 2017." Id. Further attributes that convinced the Supreme Court that the individual mandate exaction constitutes a tax include: its "pa[yment] into the Treasury by taxpayers when they file their tax returns"; the fact that "its amount is determined by such familiar factors as taxable income,

41

number of dependents, and joint filing status"; and its inclusion "in the Internal Revenue Code and enforce[ment] by the IRS, which . . . must assess and collect it in the same manner as taxes." Id. (citations, quotation marks, and alterations omitted). The Supreme Court also distinguished the individual mandate tax from an exaction the Court invalidated as an impermissible penalty in Bailey v. Drexel Furniture Co. The Court noted that the individual mandate, unlike the provision at issue in Drexel, contains no scienter requirement and does not constitute "prohibitory financial punishment." Id. at 2596 (internal quotation marks omitted).

Underscoring that the exaction was no penalty, the Supreme Court stated that "[n]either the [Affordable Care] Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS . . . . [I]f someone chooses to pay rather than obtain health insurance, they have fully complied with the law." Id. at 2597. The Court noted that an exaction may become so punitive that the taxing power no longer authorizes it. Id. at 2599-2600. But because the individual mandate exaction easily passed taxing power muster, the Court refrained from delving deeper into that issue. Id. at 2600 ("[T]he shared responsibility payment's practical characteristics pass muster as a tax under our narrowest interpretations of the taxing power. Because the tax at hand is

42

within even those strict limits, we need not here decide the precise point at which an exaction becomes so punitive that the taxing power does not authorize it." (internal citation omitted)).

Finally, the Supreme Court swiftly dispelled any notion that the individual mandate constituted a direct tax subject to the constitutional apportionment requirement. See id. at 2598-99; see also U.S. Const. art. I, § 9, cl. 4 ("No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census . . . ."). Having recognized only two types of direct taxes -- those on individuals as individuals and those on property -- the Supreme Court held that the individual mandate payment fits into neither category. NFIB, 132 S. Ct. at 2598-99.

At the end of the day, the Supreme Court concluded that when an exaction "need not be read to do more than impose a tax[,]" "[t]hat is sufficient to sustain it." Id. at 2598. The Court held that because the Affordable Care Act's individual mandate could be read simply as imposing a tax, Congress had the power to enact it. The Supreme Court thus squarely rejected Plaintiffs' contention that the individual mandate exaction is not a constitutional tax.

D.

Turning now to the employer mandate, it is clear from the provision's face that it possesses the "essential feature" of any tax: "it produces at least some revenue for the Government." NFIB, 132 S. Ct. at 2594; see 26 U.S.C. § 4980H. Indeed, the Congressional Budget Office estimated that the employer mandate exaction will generate $11 billion annually by 2019. See Liberty Univ., 671 F.3d at 419 (Wynn, J., concurring) (citing Letter from Douglas W. Elmendorf, Dir., Cong. Budget Office, to Hon. Nancy Pelosi, Speaker, U.S. House of Representatives, tbl. 4 (Mar. 20, 2010), available at http://www.cbo.gov/ftpdocs/113xx/doc11379/AmendReconProp.pdf).

Looking beyond the "essential feature" to other "functional" characteristics, the exaction the Affordable Care Act imposes on large employers "looks like a tax in many respects." Cf. NFIB, 132 S. Ct. at 2594. The exaction is paid into the Treasury, "found in the Internal Revenue Code[,] and enforced by the IRS," which "must assess and collect it in the same manner as" a tax. Id.; see also 26 U.S.C. §§ 4980H(d)(1), 6671(a). Further, the employer mandate lacks a scienter requirement, does not punish unlawful conduct, and leaves large employers with a choice for complying with the law -- provide adequate, affordable health coverage to employees or pay a tax. 26 U.S.C. § 4980H(a)-(b). And finally, because the exaction

44

taxes neither individuals as such nor property, it is not a direct tax subject to the apportionment requirement. Cf. NFIB, 132 S. Ct. at 2598-99.

Relying exclusively on Drexel, Liberty contends that the employer mandate exaction nevertheless "cross[es] the line" from a reasonable payment to a "potentially destructive" unconstitutional penalty. Post-Remand Opening Br. 24-25. Fatally for Liberty's argument, Drexel is easily distinguishable from the case at hand.

In Drexel, the Supreme Court invalidated a "so-called tax on employing child laborers" as an impermissible penalty. See NFIB, 132 S. Ct. at 2595 (citing Drexel, 259 U.S. 20). The Supreme Court did so ostensibly because the penalty: (1) carried a scienter requirement "typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law"; (2) imposed an "exceedingly heavy" financial burden -- 10 percent of an offender's net income -- even if the offender employed only one child laborer for only one day of the year; and (3) was enforced at least in part by the Department of Labor, an agency responsible not for collecting revenue but rather for punishing labor law violations. NFIB, 132 S. Ct. at 2595 (citing Drexel, 259 U.S. at 36-37). In stark contrast to the penalty the Court struck down in Drexel, the employer mandate exaction is devoid of any

45

scienter requirement and does not punish unlawful behavior. Further, the exaction is collected by the Secretary of the Treasury in the same manner as a tax. 26 U.S.C. §§ 4980H(d)(1), 6671(a).

Moreover, the amount of the employer mandate exaction is proportionate rather than punitive. If Liberty offers adequate health coverage, but that coverage fails to satisfy the employer mandate's affordability and minimum value requirements, Liberty will be taxed $3000 times the number of employees who receive government assistance, prorated on a monthly basis and subject to a cap. Id. § 4980H(b)(1)-(2); see supra at 13. And if Liberty fails to offer adequate health coverage to its full-time employees, it will be taxed $2000 times thirty less than its number of full-time employees -- presumably all of whom are being deprived of coverage -- prorated over the number of months for which Liberty is liable. 26 U.S.C. § 4980H(a), (c)(1), (c)(2)(D)(i); see supra at 12-13.

We therefore reject Liberty's argument that the employer mandate imposes a penalty rather than a tax.

E.

In conclusion, the Supreme Court has already upheld the individual mandate exaction as a constitutional tax. NFIB, 132 S. Ct. at 2594-2600. Similarly, the employer mandate exaction "need not be read to do more than impose a tax." Id. at 2598.

46

Accordingly, Congress had the power to enact it, and we must uphold it.  For these reasons, as well as those provided supra in Part IV, we reject Plaintiffs' contention that Congress lacked authority under Article I of the Constitution to enact the employer mandate.

## VI.

Finally, Plaintiffs challenge the Act on various religion-based grounds.  In their second amended complaint, Plaintiffs allege that the Act violates their rights under the First and Fifth Amendments and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1.  For the first time on this appeal, they also seek to challenge on religious grounds certain regulations implementing the Act.  We initially consider the claims alleged in the second amended complaint and then those raised for the first time on this appeal.

### A.

#### 1.

Plaintiffs maintain that both the employer mandate and the individual mandate violate their free exercise rights under the First Amendment and RFRA.  Specifically, they allege that the mandates unlawfully force them to violate their religious belief

47

that "they should play . . . no part in facilitating, subsidizing, easing, funding, or supporting . . . abortions."[8]

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. However, the Clause does not compel Congress to exempt religious practices from a "valid and neutral law of general applicability." Emp't Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 879 (1990) (internal quotation marks omitted). This is so even if such a law "has the incidental effect of burdening a particular religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).

A neutral law of general applicability thus does not violate the Free Exercise Clause. The Act is just such a law. It has no object that "infringe[s] upon or restrict[s] practices because of their religious motivation," id. at 533 (emphasis added), and imposes no "burden[] only on conduct motivated by religious belief," id. at 543 (emphasis added). Relying on

---

[8] Plaintiffs have also attempted to characterize their complaint as raising other religious liberty claims, for example, that "[t]hey are Christians who believe in living out their sincerely held religious beliefs in everyday life, including in the lifestyle choices they make, of which managing their health care privately is but one example." See, e.g., Original Opening Br. 10. But, as the district court recognized, "[a] fair reading of the complaint does not support this novel characterization, and the parties have not briefed these issues." Liberty Univ., 753 F. Supp. 2d at 641 n.17.

48

Lukumi, Plaintiffs contend that the Act somehow effects a "religious gerrymander[]." Original Opening Br. 45; see Lukumi, 508 U.S. at 534-35 (internal quotation marks omitted). But it does no such thing. Unlike the ordinances struck down in Lukumi, the Act does not set apart any particular religious group. See 508 U.S. at 535-38. The Act therefore does not violate the Free Exercise Clause.

Plaintiffs' RFRA claim fares no better. RFRA provides that, "even if the burden results from a rule of general applicability," the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

Thus, by its own terms, RFRA directs application of strict scrutiny only if the Government "substantially burden[s]" religious practice. Id.; see also Goodall by Goodall v. Stafford Cnty. Sch. Bd., 60 F.3d 168, 171 (4th Cir. 1995) ("[I]f the [plaintiffs] cannot show that their exercise of religion is substantially burdened by the [government's] policy, the [government] is not required to come forth with proof of its interest."). A substantial burden, in turn, requires "substantial pressure on an adherent to modify his behavior and

49

to violate his beliefs." <u>Thomas v. Review Bd. of Ind. Emp't Sec. Div.</u>, 450 U.S. 707, 718 (1981).

Plaintiffs present no plausible claim that the Act substantially burdens their free exercise of religion, by forcing them to facilitate or support abortion or otherwise. The Act specifically provides individuals the option to purchase a plan that covers no abortion services except those for cases of rape or incest, or where the life of the mother would be endangered. <u>See</u> 42 U.S.C. § 18054(a)(6) (requiring that at least one plan on each exchange exclude non-excepted abortions from coverage). The Act also does nothing to prevent employers from providing such a plan. Furthermore, the Act allows an individual to obtain, and an employer to offer, a plan that covers <u>no</u> abortion services at all, not even excepted services. <u>See</u> 42 U.S.C. § 18023(b)(1)(A)(i).[9]

Given that the mandates themselves impose no substantial burden, the option of paying a tax to avoid the mandates' requirements certainly imposes no substantial burden. On the

---

[9] Plaintiffs also argue that a requirement "that individuals and employers pay at least one dollar per person per month directly into an account to cover elective abortions" unlawfully burdens their religious exercise. Post-Remand Opening Br. 37 (citing 42 U.S.C. § 18023(b)(2)). But this provision applies only if individuals <u>choose</u> to enroll in a plan through a health insurance exchange that elects to cover abortions, for which federal funding may not be used. Post-Remand Resp. Br. 34-35 n.13; <u>see</u> 42 U.S.C. § 18023(b)(1)(B)(i), (b)(2)(A)-(B).

50

contrary, this option underscores the "lawful choice" Plaintiffs have to avoid any coverage they might consider objectionable. See NFIB, 132 S. Ct. at 2600; see also Goodall, 60 F.3d at 171 ("It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely operates so as to make the practice of the individual's religious beliefs more expensive." (internal quotation marks omitted)).

To the extent Plaintiffs contend that the tax payment itself is a substantial burden, as the district court explained, the Act "contains strict safeguards at multiple levels to prevent federal funds from being used to pay for [non-excepted] abortion services." Liberty Univ., 753 F. Supp. 2d at 642-43; see 42 U.S.C. § 18023(b)(2)(A) (prohibiting use of the Act's cost-sharing reduction or tax credits for abortion coverage); id. § 18023(b)(2)(B)-(C) (requiring separate premiums for coverage of abortion services); Exec. Order No. 13,535, 75 Fed. Reg. 15,599 (Mar. 29, 2010) (implementing abortion restrictions). We note also that "[t]axpayers generally are not permitted to avoid payment of a tax when their objections concern the manner in which government revenues are expended." Olsen v. Comm'r, 709 F.2d 278, 282 (4th Cir. 1983) (collecting cases); see also Doremus v. Bd. of Educ., 342 U.S. 429, 433 (1952) ("[T]he interests of a taxpayer in the moneys of the

51

federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure.").

Accordingly, Plaintiffs' free exercise claims -- both under the Constitution and under RFRA -- fail.

2.

Plaintiffs also allege that the two religious exemptions in the Act violate the Establishment Clause and their Fifth Amendment equal protection rights. Of course, the mere existence of religious exemptions in a statute poses no constitutional problem. Rather, the Constitution freely permits exemptions that will allow "religious exercise to exist without sponsorship and without interference." Walz v. Tax Comm'n, 397 U.S. 664, 669 (1970). Permissible benevolence morphs into impermissible sponsorship only when the "proposed accommodation singles out a particular religious sect for special treatment." Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 706-07 (1994). Thus, a court applies strict scrutiny only to statutes that "make[] explicit and deliberate distinctions between different religious organizations." Larson v. Valente, 456 U.S. 228, 246-47 & n.23 (1982).

A statute without such distinctions, even one that has a disparate impact on different denominations, need only satisfy the less rigorous test set forth in Lemon v. Kurtzman, 403 U.S.

52

602 (1971). See Hernandez v. Comm'r, 490 U.S. 680, 695 (1989); Koenick v. Felton, 190 F.3d 259, 264-65 (4th Cir. 1999) ("[U]ntil the Supreme Court overrules Lemon and provides an alternative analytical framework, this Court must rely on Lemon in evaluating the constitutionality of legislation under the Establishment Clause." (internal quotation marks omitted)); cf. Cutter v. Wilkinson, 544 U.S. 709, 717 n.6, 720 (2005) (rejecting an Establishment Clause challenge to a statute making no explicit religious distinction, without reaching Lemon, "because it alleviates exceptional government-created burdens on private religious exercise"). The Lemon test requires "a secular legislative purpose," a "principal or primary effect . . . that neither advances nor inhibits religion," and no "excessive government entanglement with religion." 403 U.S. at 612-13 (internal quotation marks omitted).

The first exemption Plaintiffs challenge is the individual mandate's religious conscience exemption. See 26 U.S.C. § 5000A(d)(2)(A). Plaintiffs maintain that this exemption discriminates against their religious practice by applying only to sects that conscientiously oppose all insurance benefits, provide for their own members, and were established before December 31, 1950. The religious conscience exemption adopts an exemption of the Social Security Amendments of 1965 under 26 U.S.C. § 1402(g), which courts have consistently found

53

constitutional under the Establishment Clause and the Fifth Amendment.  See, e.g., Droz v. Comm'r, 48 F.3d 1120, 1124-25 (9th Cir. 1995); Hatcher v. Comm'r, 688 F.2d 82, 84 (10th Cir. 1979) (per curiam); Jaggard v. Comm'r, 582 F.2d 1189, 1189-90 (8th Cir. 1978) (per curiam); Henson v. Comm'r, 66 T.C. 835, 838-40 (1976); Palmer v. Comm'r, 52 T.C. 310, 314-15 (1969).  As the Supreme Court explained with respect to the § 1402(g) exemption, "Congress granted an exemption . . . [to] a narrow category which was readily identifiable," i.e., "persons in a religious community having its own 'welfare' system."  United States v. Lee, 455 U.S. 252, 260-61 (1982).

Moreover, this exemption makes no "explicit and deliberate distinctions" between sects, Larson, 456 U.S. at 246 n.23, and so is subject only to the Lemon test, see Droz, 48 F.3d at 1124. The exemption passes the Lemon test because it has a secular purpose:  "to ensure that all persons are provided for, either by the [Act's insurance] system or by their church."  Id.; see also Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 335 (1987) ("[I]t is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions.").  The exemption's principal effects also neither advance nor inhibit religion, but only assure that all

54

individuals are covered, one way or the other. And there is no excessive entanglement with religion. Cf. Zelman v. Simmons-Harris, 536 U.S. 639, 668 (2002) (O'Connor, J., concurring) (noting that the Court has previously "folded the entanglement inquiry into the primary effect inquiry," which "ma[kes] sense because both inquiries rely on the same evidence"); Madison v. Riter, 355 F.3d 310, 319 (4th Cir. 2003) (same).

The second individual mandate exemption challenged by Plaintiffs is the health care sharing ministry exemption. See 26 U.S.C. § 5000A(d)(2)(B). Plaintiffs maintain that it unconstitutionally selects an arbitrary formation date of December 31, 1999 as the eligibility cutoff. But even if the exemption's cutoff date is arbitrary, it is not unconstitutional. For neither the cutoff's text nor its history suggests any deliberate attempt to distinguish between particular religious groups. Accordingly, the cutoff need only satisfy the Lemon test. See Hernandez, 490 U.S. at 695-96; cf. Larson, 456 U.S. at 254 (applying strict scrutiny only when the legislative history demonstrated "the provision was drafted with the explicit intention of including particular religious denominations and excluding others").

Applying Lemon, the date serves at least two "secular legislative purpose[s]." 403 U.S. at 612. First, the cutoff ensures that the ministries provide care that possesses the

55

reliability that comes with historical practice. Second, it accommodates religious health care without opening the floodgates for any group to establish a new ministry to circumvent the Act. The "primary effect" of the cutoff accordingly "neither advances nor inhibits religion." Id. Further, given that it applies only secular criteria, the cutoff does not "foster an excessive government entanglement with religion." Id. at 613 (internal quotation marks omitted).

Plaintiffs additionally contend that both the religious conscience exemption and the health care sharing ministry exemption violate their Fifth Amendment equal protection rights. In furtherance of this argument they maintain that both exemptions are subject to the heightened scrutiny that applies "if the plaintiff can show the basis for the distinction was religious . . . in nature." Olsen, 709 F.2d at 283; Post-Remand Opening Br. 56. Of course, "[i]f the justification for the distinction is secular, it need only be rational." Olsen, 709 F.2d at 283; see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 441-42 (1985). Here, the distinction made between sects that oppose insurance and provide for themselves in their own welfare system and those that do not, and the distinction made between ministries formed before 1999 and those formed after, are secular and thus subject only to rational basis review. See Olsen, 709 F.2d at 283. Both distinctions are

56

rationally related to the Government's legitimate interest in accommodating religious practice while limiting interference in the Act's overriding purposes. Cf. Corp. of the Presiding Bishop, 483 U.S. at 335.

We therefore conclude that Plaintiffs have failed to state any plausible claim that the Establishment Clause or the Fifth Amendment provide a basis for relief.

B.

In their recent post-remand briefs, Plaintiffs argue at length that certain regulations implementing neither the individual nor the employer mandate but another portion of the Act -- § 1001, codified in part at 42 U.S.C. § 300gg-13 -- violate their religious rights.[10] See, e.g., Post-Remand Opening Br. 2-5, 43-44. These new regulations require group health plans to cover all FDA-approved contraceptive methods. See 45 C.F.R. § 147.130(a)(1)(iv) (2011); HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines, available at http://www.hrsa.gov/womensguidelines.

Plaintiffs' second amended complaint mentions neither § 1001 of the Affordable Care Act nor 42 U.S.C. § 300gg-13.

---

[10] Section 1001 of the Affordable Care Act, inter alia, amended the Public Health Service Act to require "[a] group health plan and a health insurance issuer offering group or individual health insurance" to provide, "with respect to women," free "preventative care and screenings."

57

Further, the complaint does not mention contraception.  To be sure, the complaint specifies that Plaintiffs have "sincerely held religious beliefs that abortions . . . are murder and . . . they should play . . . no part in facilitating, subsidizing, easing, funding, or supporting . . . abortions."  But the complaint gives no notice that Plaintiffs challenge methods of contraception or include within their challenge to "abortion" all the forms of contraception they now label "abortifacients."[11]

Moreover, Plaintiffs did not challenge these regulations, or make any argument related to contraception or abortifacients, in the district court, in their first appeal before us, or in their Supreme Court briefs.  The Supreme Court in turn ordered a limited remand simply "for further consideration in light of National Federation of Independent Business v. Sebelius," which did not discuss this issue.  See Liberty Univ., 133 S. Ct. 679.

---

[11] In their new briefs, Plaintiffs seek to challenge as abortifacients forms of FDA-approved contraception that may act after fertilization, including emergency contraceptive pills and intra-uterine devices.  See Post-Remand Opening Br. 3-5.  But the Government does not define such contraceptives as abortifacients or abortion.  Well-established federal law defines "pregnancy" to "encompass[] the period of time from implantation until delivery."  45 C.F.R. 46.202(f) (2001).  The forms of contraception that Plaintiffs now challenge, as they themselves recognize, do not act after implantation, so they do not terminate a "pregnancy" as defined in this regulation.  See FDA, Birth Control: Medicines To Help You, available at http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm.

58

Nevertheless, for the first time in their post-remand briefs, Plaintiffs seek to challenge these regulations. Generally, "a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120 (1976); accord Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993). This rule applies with equal force when a party attempts to raise an issue for the first time after remand. See Rowland v. Am. Gen. Fin., Inc., 340 F.3d 187, 191 n.1 (4th Cir. 2003).

Of course, in our discretion, we can make "[e]xceptions to this general rule" but we do so "only in very limited circumstances." Muth, 1 F.3d at 250. The Supreme Court has explained that we are "justified" in making such an exception when the "proper resolution is beyond any doubt" or "injustice might otherwise result." Singleton, 428 U.S. at 121 (internal quotation marks omitted). We have also recognized that certain other "limited circumstances" may justify such action, e.g., when refusal to do so would constitute plain error or result in a fundamental miscarriage of justice, Muth, 1 F.3d at 250, or where there is an intervening change in the case law, Holland v. Big River Minerals Corp., 181 F.3d 597, 605 (4th Cir. 1999).

Plaintiffs do not contend that any of these "limited circumstances" apply here. There is good reason for this; none does. We recognize that the Government initially promulgated the regulations in question while this case was pending (i.e.,

approximately a month before the issuance of our earlier opinion). See Liberty Univ., 671 F.3d 391; 76 Fed. Reg. 46,621 (Aug. 3, 2011). But a new implementing regulation cannot "become a vehicle for converting plaintiffs' lawsuit into a challenge to the new regulation" when a "challenge to th[at] regulation would raise substantially different legal issues from the . . . arguments [already] propounded in th[e] lawsuit." Phillips v. McLaughlin, 854 F.2d 673, 676-77 (4th Cir. 1988); see also Kinney v. Dist. of Columbia, 994 F.2d 6, 10 (D.C. Cir. 1993) ("[T]he term 'intervening change in the law,' [does] not refer[] to a prospective [regulatory] change that could not affect rights already accrued . . . .").

Furthermore, several compelling reasons counsel against taking up Plaintiffs' challenge to the new regulations here. To do so would require us not only to resolve a claim not considered below, but also to do this in a second appeal three years after the initiation of this lawsuit. To do so would also require us to interpret new regulations, implementing a provision of the Act never challenged in the second amended complaint.[12] And to do so would require us to consider at this

---

[12] Contrary to the Plaintiffs' assertion, the second amended complaint's reference to § 1302 of the Affordable Care Act did not preserve for our review a challenge to 42 U.S.C. § 300gg-13. See Post-Remand Reply Br. 17-20 & n.7 (arguing that the definition of "'minimum essential coverage' requires a (Continued)

premature stage an argument that other appellate courts have before them in cases in which plaintiffs have properly pled the issue and a district court has addressed it.

Indeed, several of our sister circuits are considering such cases, timely filed _after_ the regulations at issue were promulgated. _See, e.g._, _Hobby Lobby Stores, Inc. v. Sebelius_, No. 12-6294, 2013 WL 3216103 (10th Cir. June 27, 2013) (en banc); _Gilardi v. U.S. Dep't of HHS_, No. 13-5069 (D.C. Cir. docketed Mar. 5, 2013); _Conestoga Wood Specialties Corp. v. Sec'y of HHS_, No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8,

---

circuitous trip through various sections of the Act," including § 1302, which defines "essential health benefits" to "include at least preventive and wellness services partially defined in 42 U.S.C. § 300gg-13" and "has been part of Plaintiffs' challenges from the outset"). Section 1302, codified at 42 U.S.C. § 18022, gives the Secretary authority to define what must be included in an "essential health benefits package," a "wholly different term" from "minimum essential coverage." _Florida ex rel. Att'y Gen. v. U.S. Dep't of HHS_, 648 F.3d 1235, 1251 (11th Cir. 2011), _rev'd in part on other grounds_, _NFIB_, 132 S. Ct. 2566.

> The term "essential health benefits package" refers to the comprehensive benefits package that must be provided by plans in the individual and small group markets by 2014. The Act does not impose the essential health benefits package on plans offered by large group employers to their employees . . . . "Minimum essential coverage" is the type of _plan_ needed to satisfy the individual mandate . . . . Many . . . plan types will satisfy the mandate even if they do not have the "essential health benefits package" and regardless of the level of benefits or coverage.

_Id._ at 1250–51 (internal citations omitted).

61

2013); Grote v. Sebelius, 708 F.3d 850 (7th Cir. 2013); Annex Med., Inc. v. Sebelius, No. 13-1118 (8th Cir. docketed Jan. 14, 2013); Korte v. Sebelius, No. 12-3841, 2012 WL 6757353 (7th Cir. Dec. 28, 2012); Autocam Corp. v. Sebelius, No. 12-2673 (6th Cir. docketed Dec. 26, 2012); Wheaton Coll. v. Sebelius, 703 F.3d 551 (D.C. Cir. 2012); O'Brien v. U.S. Dep't of HHS, No. 12-3357 (8th Cir. docketed Oct. 4, 2012).

Finding no circumstance justifying a premature resolution of Plaintiffs' new arguments and compelling reasons for refusing to do so in this case, we decline to reach Plaintiffs' challenge to the new regulations.[13]

VII.

In sum, in light of the Supreme Court's teachings in NFIB, we hold that we have jurisdiction to decide this case. On the merits, we affirm the judgment of the district court dismissing the complaint in its entirety for failure to state a claim upon which relief can be granted.

AFFIRMED

---

[13] For similar reasons, we decline to address Plaintiffs' post-remand arguments that the regulations exempting religious employers from required contraception coverage and accommodating eligible non-profit employers unconstitutionally discriminate against their religious views. See 45 C.F.R. 147.130; 78 Fed. Reg. 39,869 (July 2, 2013).