**NORTHERN ARAPAHO TRIBE, on its own behalf and on behalf of its members, Plaintiff,**

v.

**Sylvia BURWELL, Secretary of the United States Department of Health & Human Services, and Jacob J. Lew, Secretary of the United States Department of Treasury, Defendants.**

**Case No. 14–CV–247–SWS.**

United States District Court, D. Wyoming.

Signed Feb. 26, 2015.

Andrew W. Baldwin, Berthenia S. Crocker, Janet E. Millard, Kelly A. Rudd, Mandi Anne Vuinovich, Baldwin Crocker & Rudd, Lander, WY, for Plaintiff.

Alice S. Lacour, Jacek Pruski, United States Department of Justice, Washington, DC, Nicholas Vassallo, U.S. Attorney's Office, Cheyenne, WY, for Defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

SCOTT W. SKAVDAHL, District Judge.

This matter comes before the Court on the Northern Arapaho Tribe's Motion for Preliminary Injunction. (Doc. 8.) Defendants filed an opposition to the motion. (Doc. 26.) The Court held an evidentiary hearing on the matter on February 12, 2015. Having considered the evidence and affidavit testimony presented at the hearing, the parties' briefs, the arguments of counsel, the record herein, and being otherwise fully advised, the Court finds and concludes a preliminary injunction should be denied.

### *BACKGROUND*

This case asks whether the Northern Arapaho Tribe (the "Tribe"), a federally-recognized Indian tribe, should be exempted from the "large employer mandate" of the Patient Protection and Affordable Care Act of 2010 (the "ACA"). The large employer mandate is found at 26 U.S.C. § 4980H and, in short, requires a large employer to sponsor a health insurance plan meeting certain minimum require-

ments for its full-time employees or face an "assessable payment" if it fails to do so. As relevant to this case, § 4980H(c)(2) defines a "large employer" as employing an average of at least 50 full-time employees on business days.

The Tribe operates several different economic enterprises on the Wind River Indian Reservation in Wyoming, including a casino, a convenience store, a gas station, a grocery store, and other businesses. The Tribe employs over 900 people in its economic enterprises and governmental agencies. (Conrad Decl. ¶¶ 2, 4.) Nonetheless, the Tribe argues it should not be subject to the large employer mandate.

After the ACA was passed, the Tribe discovered its employees could buy health insurance plans on the federal health insurance exchange that offered superior coverage at a lower price than any other plan previously available in the insurance market. The Tribe encouraged and assisted its members in purchasing individual health insurance plans through the federal exchange, including paying up to 80% of the premiums for its tribal members.

As of January 1, 2015, the ACA's large employer mandate became effective. The Tribe alleges the health insurance plan it would offer as a large employer would be more expensive for its employees and offer less coverage than the individual plans available on the federal exchange. The Tribe believes the individual health insurance plans purchased through the federal exchange are superior to any employer-sponsored insurance plan it could provide under the large employer mandate, primarily because most of the Tribe's members qualify for income-based tax credits and cost-sharing exemptions under the individual plans that are unavailable within an employer-sponsored plan.

The Tribe has filed this lawsuit against the Secretary of the United States Department of Health and Human Services and the Secretary of the United States Department of Treasury (collectively, "Defendants"). The Tribe seeks to be exempted from the large employer mandate and asserts its members should be permitted to continue to obtain individual health insurance plans on the federal exchange. In the instant motion, the Tribe requests a preliminary injunction that would exempt it from the large employer mandate during the pendency of the case. Defendants oppose a preliminary injunction arguing this lawsuit is barred by threshold matters and, if examined on the merits, the Tribe cannot establish its right to injunctive relief.

## RELEVANT LAW

The ACA "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 2580, 183 L.Ed.2d 450 (2012). The ACA was codified in scattered sections of Title 26 and Title 42 of the United States Code. Title 26 is the Internal Revenue Code.

### 1. *The Individual Mandate*

The so-called "individual mandate" became enforceable in 2014 and it requires most individuals to maintain a minimum level of health insurance coverage or be subject to a monetary tax "penalty." 26 U.S.C. § 5000A. Members of Indian tribes, including the members of the Plaintiff Tribe here, are subject to the mandate but nonetheless exempt from any tax penalty. *Id.* §§ 5000A(d)(1), (e)(3); *Nat'l Fed'n,* 132 S.Ct. at 2580.

To assist with meeting the individual mandate, the ACA provided for the creation of health insurance exchanges whereby individuals can obtain health insurance coverage. 42 U.S.C. §§ 18031–18044. Each plan offered through an exchange must provide a minimum level of coverage, as defined by Congress. *Id.* § 18021.

Wyoming opted not to set up its own state exchange. Consequently, qualifying Wyoming citizens may obtain an individual health insurance plan through the federally-facilitated exchange. *See* 42 U.S.C. § 18041(c)(1) (requiring the Department of Health and Human Services to "establish and operate" an exchange within a state that opts out of setting up its own).

The ACA also enacted new tax credits and cost-sharing reductions in an attempt to make health insurance coverage on the exchanges more affordable for low- and middle-income individuals.[1] For taxpayers whose household income is between 100% and 400% of the poverty line, the ACA establishes premium tax credits. 26 U.S.C. § 36B.[2] These premium tax credits are intended to reduce a qualifying tax payer's net cost of insurance, and they are advanceable and refundable so that individuals with little or no income tax liability can still benefit from them. *See* 42 U.S.C. § 18082.

In addition to the premium tax credits, the ACA also provides for federal payments to insurers to help cover certain individuals' cost-sharing expenses for insurance obtained through an exchange. 42 U.S.C. § 18071.[3] These cost-sharing subsidies are intended to reduce a qualifying individual's out-of-pocket expenses when they use health care services, such as deductibles, copayments, and coinsurance. Normally, to qualify for these cost-sharing subsidies, the individual's household income must fall between 100% and 400% of the poverty line. *Id.* § 18071(b)(2), (c)(1)(A). Specific to this case, though,

members of an Indian tribe qualify for these cost-sharing subsidies if the member's household income is 300% or less of the poverty line, and under subsection (d)(1)(B), the plan issuer "shall eliminate any cost-sharing under the plan" for the qualifying Indian, which effectively reduces that insured's out-of-pocket expense to zero. "The ACA eliminates all cost-sharing for Indians under 300 percent of the federal poverty level...." Alex Dyste, Note, *It's Hard Out Here for an American Indian: Implications of the Patient Protection and Affordable Care Act for the American Indian Population*, 32 Law & Ineq. 95, 119 (2014).

These two incentives (premium tax credits and reduced or eliminated cost-sharing) are only available as part of an individual health insurance plan obtained through an exchange. *See* 26 U.S.C. § 36B(c)(2)(B) (premium tax credit is unavailable during months when the individual is eligible for sufficient coverage outside of the exchange market); 42 U.S.C. § 18071(f)(2) (cost-sharing reduction is not allowed during months when the individual does not qualify for a premium tax credit). In short, these two incentives are only available to those obtaining individual health insurance plans through an exchange, and individual plans are only available through an exchange when alternative coverage (e.g., insurance through an employer) is unavailable, thus the rub in this case.

## 2. *The Large Employer Mandate*

On January 1, 2015, the large employer mandate[4] went into effect. It requires

---

**1.** Disagreement exists regarding whether certain tax credits are available to those residents of states, like Wyoming, that opted out of running their own insurance exchanges. That question is currently before the United States Supreme Court, *see King v. Burwell,* — U.S. ——, 135 S.Ct. 475, 190 L.Ed.2d 355 (2014), but it is not at issue in this case.

**2.** Section 1401 of the ACA.

**3.** Section 1402 of the ACA.

**4.** At the preliminary injunction hearing, counsel for Defendants noted the large employer mandate is not a "mandate" in the same sense as is the individual mandate. Specifically, the individual mandate says subject in-

employers with at least 50 full-time employees to offer to their employees a health insurance plan meeting a certain minimum level of coverage. *See* 26 U.S.C. § 4980H. Failure to do so results in the large employer owing "an assessable payment." *Id.* § 4980H(a), (b). The ACA requires applicable large employers to report to the federal government on the health insurance coverage they offer to their full-time employees to determine whether any assessable payment is owed. *See id.* § 6056. State and local governments are likewise subject to the large employer mandate. *See id.* §§ 6055(d), 6056(e) (addressing the reporting requirements for governmental units or agencies).

### 3. *The Treasury Regulations at Issue*

In implementing the ACA, the Department of Treasury and the Internal Revenue Service (IRS) issued various federal regulations after a notice-and-comment period. *See* 26 U.S.C. § 7805 (providing the Secretary of the Department of Treasury the authority to create necessary rules and regulations for enforcing the Internal Revenue Code).[5] The Tribe takes exception to three final regulations (a/k/a federal tax regulations) promulgated and finalized by the Treasury in this case:

(1) 26 C.F.R. § 54.4980H–1, finalized on February 12, 2014, defined "government entity" to include Indian tribal governments;

(2) 26 C.F.R. § 301.6056–1, finalized on March 10, 2014, concerns reporting requirements for large employers and defines "governmental unit," similar to "government entity," to

include Indian tribal governments; and

(3) 26 C.F.R. § 1.6055–1, also finalized on March 10, 2014, defines "governmental unit" to include Indian tribal governments.

These final regulations expressly subject Indian tribes that employ 50 or more full-time employees to the ACA's large employer mandate and its reporting requirements. Federal tax regulations provide the official interpretation of the Internal Revenue Code.

### THE PARTIES' ARGUMENTS

In the years preceding the ACA, the Tribe worked to provide cost-effective health insurance to its employees and tribal members, including through a commercial insurance carrier and a self-insurance system. (Conrad Decl. ¶ 7.) These efforts proved unsuccessful. (*Id.*)

Once the ACA was passed, the Tribe discovered its members could obtain individual health insurance plans through the federal exchange that were superior to the plans the Tribe had been able to offer its members in the preceding years. (*Id.* ¶ 9.) And the Tribe pays about 80% of the cost of the insurance premium for individual plans obtained through the exchange. (*Id.* ¶ 8.) The Tribe asserts that without the reduced cost-sharing and premium tax credits, its Native American employees could not afford to keep health insurance coverage. (*Id.* ¶ 9.)

The Tribe's basic argument is that Congress never intended to subject Indian tribes to the large employer mandate, and

---

dividuals "shall" carry sufficient health care insurance, 26 U.S.C. § 5000A(a), whereas the large employer mandate contains no such command, *see* 26 U.S.C. § 4980H. The practical effects of the mandates are identical, however, in that each requires the subject to comply or face certain tax consequences.

5. The IRS is a bureau of the Department of Treasury. It is responsible for collecting taxes and administering the Internal Revenue Code. For brevity, the Court will refer to the federal regulations at issue here as the Treasury's regulations.

the Treasury has erred by including Indian tribes within its definitions. And if the Tribe is subject to the large employer mandate, its Indian employees cannot qualify for the premium tax credits and reduced cost-sharing incentives. According to the Tribe, this will result in its Indian employees paying more for their insurance or, since tribal members are exempt from the individual mandate's tax penalty, the Indian employees will simply forego health insurance altogether.

Defendants argue Congress's intent to include Indian tribes as large employers is clear and unambiguous in the ACA. Accordingly, argue Defendants, the Treasury was within its authority to include Indian tribes within the large employer mandate.

As set forth below, this Court finds there are multiple threshold procedural impediments to the Tribe's motion for preliminary injunction, and to the extent those hurdles could be cleared, the Tribe's substantive arguments nonetheless fail on their merits.

### DISCUSSION

With this backdrop in place, the Court turns to the issues that must be considered in determining whether a preliminary injunction in the Tribe's favor is warranted. The Court begins by addressing the two threshold issues raised by Defendants.

### 1. *The Anti–Injunction Act (AIA)*

In their first argument, Defendants contend the Anti–Injunction Act (AIA) prohibits this lawsuit.[6] (Doc. 13 at pp. 9–11.) The AIA provides in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). Here, the Tribe is preemptively challenging the legality of the Treasury regulations in order to restrain the IRS from assessing the payments described in 26 U.S.C. § 4980H. Accordingly, the Court must consider whether the AIA prohibits this lawsuit.[7]

■ "Because of the Anti–Injunction Act, taxes can ordinarily be challenged only after they are paid, by suing for a refund." *Nat'l Fed'n*, 132 S.Ct. at 2582. The ACA and AIA "are creatures of Congress's own creation," and "[h]ow they relate to each other is up to Congress...." *Id.* at 2583. The United States Supreme Court made clear that the AIA applies where Congress chooses to describe a payment as a "tax." *Id.* at 2582–2584 (finding the individual mandate's "penalty" did not trigger the AIA). Indeed, the AIA applies to a payment labeled as a "tax" even where it is not a true tax. *Id.* at 2583 (citing *Bailey v. George*, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922)). Accord-

6. Defendants contend the AIA strips a court of jurisdiction to entertain requests for an injunction prohibiting the collection of federal taxes. However, the concurring opinion in *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir.2013) (en banc), determined the AIA is non-jurisdictional. *Id.* at 1158–59 (Gorsuch, J., concurring).

7. The Declaratory Judgment Act also prohibits suits for declaratory relief "with respect to federal taxes." 28 U.S.C. § 2201(a). The Tribe's complaint seeks a declaration under the Declaratory Judgment Act that it is not

subject to the large employer mandate. (*See* Doc. 1 at ¶¶ 55, 62.) The Supreme Court has noted that "it is in any event clear that the federal tax exception to the Declaratory Judgment Act is at least as broad as the prohibition of the Anti–Injunction Act." *Alexander v. Americans United Inc.*, 416 U.S. 752, 781 n. 10, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974). The Court will focus its discussion on the Anti–Injunction Act, but the same reasoning applies to the Declaratory Judgment Act. *See Wyo. Trucking Ass'n Inc. v. Bentsen*, 82 F.3d 930, 933 (10th Cir.1996).

ingly, the Court examines the statutory language chosen by Congress to describe the payment associated with the large employer mandate.

Section 4980H first describes the exaction faced by an employer under the large employer mandate as an "assessable payment." 26 U.S.C. § 4980H(a), (b)(1). Indeed, it is referred to as an "assessable payment" no less than seven times in six different subsections of § 4980H. *Id.* § 4980H(a), (b)(1), (c)(2)(D)(i)(I), (d)(1), (d)(2), (d)(3). If "assessable payment" was the only term used in § 4980H, this would be a simple matter. However, Congress also referred to the exaction as a "tax" on two occasions in § 4980H. *Id.* § 4980H(b)(2) (capping the "aggregate amount of tax" owed by an employer under the large employer mandate), (c)(7) (explaining the nondeductible nature of the "tax imposed by this section"). Thus, Congress has described a large employer's payment under § 4980H as both a "tax" (which would be subject to the AIA) and as something other than a "tax" (which would remove it from the AIA's reach). Other Courts have faced this discrepancy and have reached conflicting conclusions. *Compare Halbig v. Sebelius,* 27 F.Supp.3d 1, 14–15 (D.D.C.2014) (finding "assessable payment" and "tax" to be interchangeable terms that denote a tax subject to the AIA)[8] *with Liberty Univ., Inc. v. Lew,* 733 F.3d 72, 88 (4th Cir.2013) ("Because Congress initially and primarily refers to the exaction as an 'assessable payment' and not a 'tax,' the statutory text suggests that Congress did not intend the exaction to be treated as a tax for purposes of the AIA.").

■ The Court finds the reasoning of the United States District Court for the District of Columbia in *Halbig* to be convincing and, therefore, holds the large em-

ployer mandate exaction constitutes a "tax" for purposes of the AIA. Congress chose to call the exaction a "tax" in two different subsections of § 4980H. "Congress' 'inklings' are best determined by the statutory language that it chooses[.]" *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495 n. 13, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (noting "the strong presumption that Congress expresses its intent through the language it chooses").

Perhaps even more telling, Congress described this particular exaction as a "tax" elsewhere in the ACA.

> The Secretary shall establish a separate appeals process for employers who are notified under subsection (e)(4)(C) that the employer may be liable for a tax imposed by section 4980H of title 26 with respect to an employee because of a determination that the employer does not provide minimum essential coverage through an employer-sponsored plan or that the employer does provide that coverage but it is not affordable coverage with respect to an employee.

42 U.S.C. § 18081(f)(2)(A); *see also Nat'l Fed'n,* 132 S.Ct. at 2583–84 (concluding the individual mandate was not subject to the AIA, in part because it was not referred to as a "tax" in other sections of the ACA); *but see Liberty Univ.,* 733 F.3d at 88 (mistakenly concluding "Congress did not otherwise indicate that the employer mandate exaction qualifies as a tax for AIA purposes").

Finally, the Fourth Circuit in *Liberty University* found it would be anomalous if the individual mandate exaction was not subject to the AIA (as the Supreme Court

---

8. *Halbig* was later reversed by the Court of Appeals for the District of Columbia, *Halbig v. Burwell,* 758 F.3d 390 (D.C.Cir.2014), but the portion of the district court's decision concerning the AIA was not challenged on appeal.

held in *National Federation*) but the large employer mandate exaction was subject to the AIA. *See Liberty Univ.*, 733 F.3d at 88–89. The Court finds the District of Columbia's reasoning persuasive on this question.

Nor does it seem anomalous that Congress would have intended to allow pre-enforcement challenges by individuals while prohibiting pre-enforcement suits by employers. In fact, another provision in Section 4980H confirms that Congress assumed that employers would raise their challenges in post-collection suits. The statute provides that the Secretary of the Treasury "shall prescribe rules ... for the *repayment* of any assessable payment ... if such payment is based on the allowance or payment of an applicable premium tax credit or cost-sharing reduction with respect to an employee, such allowance or payment is subsequently disallowed, and the assessable payment would not have been required to be made but for such allowance or payment." 26 U.S.C. § 4980H(d)(3) (emphasis added). No such comparable provision exists with respect to individuals. *See generally* 26 U.S.C. § 5000A.

*Halbig*, 27 F.Supp.3d at 15–16. Accordingly, the Court finds Congress intended the disparate treatment between the individual mandate's exaction and the large employer mandate's exaction.

"Absent a clear indication by Congress, the Court views the term 'tax' as used in 26 U.S.C. § 7421(a), the Anti–Injunction statute, as having the same meaning as the term 'tax' as used elsewhere in the Internal Revenue Code, including in Section 4980H." *Halbig*, 27 F.Supp.3d at 15. For these reasons, the Court holds the large employer mandate constitutes a tax for purposes of the AIA.

Therefore, the AIA operates to bar this lawsuit and preclude the Tribe's request for injunctive relief. Additionally, the prohibition in the Declaratory Judgment Act "with respect to federal taxes," 28 U.S.C. § 2201(a), also appears to preclude the Tribe's request for declaratory relief. Nonetheless, in an abundance of caution and because the Tenth Circuit has determined the AIA is non-jurisdictional, *Hobby Lobby Stores*, 723 F.3d at 1158–59 (Gorsuch, J., concurring), the Court will proceed to consider the next issue raised by the parties.

### 2. *Waiver*

In their second threshold procedural issue, Defendants contend the Tribe has waived or abandoned its opportunity to challenge the final regulations promulgated by the Treasury because the Tribe failed to submit comments regarding its concerns to the Treasury during the notice-and-comment period.

#### 2.1 *Applicable Law*

In this lawsuit, the Tribe contends the contested final regulations promulgated by the Treasury violate the Administrative Procedures Act (the APA). (Doc. 1 at ¶¶ 56–62.) The APA, which is found at Title 5 of the United States Code, governs the method in which federal administrative agencies (including the Department of Treasury and the Department of Health and Human Services) may propose and establish regulations. The APA requires federal agencies to submit proposed regulations to a notice-and-comment period before they can become a final regulation. *See* 5 U.S.C. § 553. During that period, concerned parties are encouraged to submit comments, which the agency considers in determining whether the proposed regulation should be adopted as proposed, amended, or discarded. *See id.; Flanagan v. United States*, 810 F.2d 930, 934 (10th Cir.1987). Once final, the regula-

tions carry the force and effect of law. *See ABC Rentals of San Antonio v. C.I.R.*, 142 F.3d 1200, 1205 (10th Cir.1998).

■ To challenge an agency's rulemaking in court, however, a litigant must avail itself of the notice-and-comment process and bring the issue to the attention of the agency prior to filing a lawsuit.

In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the Supreme Court determined that a party wishing to challenge agency action must participate in the public process so that it alerts the agency of the party's positions and contentions and, therefore, allows "the agency to give the issue meaningful consideration." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); *Vermont Yankee*, 435 U.S. at 553–54, 98 S.Ct. 1197. *See also Wilson v. Hodel*, 758 F.2d 1369, 1373 (10th Cir. 1985) ("[A] reviewing court will not consider contentions which were not pressed upon the administrative agency.").

*Wyoming Lodging & Rest. Ass'n. v. U.S. Dep't of Interior*, 398 F.Supp.2d 1197, 1209 (D.Wyo.2005). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but erred against objection made at the time appropriate under its practice." *Wilson v. Hodel*, 758 F.2d 1369, 1372–73 (10th Cir.1985) (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952)).

### 2.2 *Analysis*

■ Here, the Tribe has not suggested it submitted written comments or raised its current concerns in any manner during the relevant notice-and-comment periods.

Further, the Tribe has not suggested its concerns were raised in other comments. *See Wyoming Lodging & Rest. Ass'n.*, 398 F.Supp.2d at 1210 (excusing waiver where many other comments raised the issues asserted by the plaintiffs). Indeed, Defendants point out that the Elk Valley Rancheria, California, another federally-recognized Indian tribe, submitted a comment where it assumed it was a large employer under the ACA. *See* Comment on FR Doc. # 2013–21783, Letter from Elk Valley Rancheria, California (dated Oct. 23, 2013) ("The Tribe has an interest in the outcome of the Proposed Rule because the Tribe is a large employer under the ACA and is thus subject to penalties if the IRS determines that the Tribe does not offer sufficient coverage to its employees."). Nothing suggests the Treasury was alerted to the Tribe's positions and contentions during the notice-and-comment period. Accordingly, absent a valid exception, the Tribe has waived the arguments it presents here by failing to bring them to the agency's attention during the public rulemaking process.

The Tribe advanced two counter-arguments at the preliminary injunction hearing to except it from waiver: (1) Defendants failed to put the Tribe on notice about the effects these final regulations would have, specifically that the individual employee Tribe members would become ineligible for the premium tax credits and reduced cost-sharing incentives if they were covered by an employer-sponsored program, and (2) the waiver principle applies only to procedural challenges whereas this is a substantive challenge.

The Tribe's first counter-argument provides it no traction. "Congress has instructed that (subject to exceptions not relevant here) publishing a regulation in the Federal Register must be considered 'sufficient to give notice of [its] contents' to

'a person subject to or affected by it.'" *George v. United States,* 672 F.3d 942, 944 (10th Cir.2012) (quoting 44 U.S.C. § 1507). The Tribe does not assert any error occurred in the Federal Register publication process. *See, e.g., Rowell v. Andrus,* 631 F.2d 699, 704 (10th Cir.1980) (notice in the Federal Register was insufficient because it did not meet the 30–day requirement of publication before taking effect).

In January 2013, the Treasury first published in the Federal Register what would become 26 C.F.R. § 54.4980H–1 (the first challenged final regulation in this lawsuit). 78 Fed.Reg. 217 (Jan. 2, 2013). A public hearing was held on this proposed regulation in April 2013, and written comments were accepted for over two months. *Id.* at 218. It became final more than a year later, in February 2014. 79 Fed.Reg. 8543 (Feb. 12, 2014).

Next, in September 2013, the Treasury published what would become 26 C.F.R. § 301.6056–1 (the second challenged final regulation in this lawsuit). 78 Fed.Reg. 54996 (Sep. 9, 2013). A public hearing on the proposed regulation was held in November 2013, and written comments were accepted for a two-month period. *Id.* at 54996. It became final in March 2014. 79 Fed.Reg. 13231 (Mar. 10, 2014). Finally, the publication and procedure for what would become 26 C.F.R. § 1.6055–1 (the third final regulation challenged by the Tribe) followed these same dates. 78 Fed. Reg. 54986 (Sep. 9, 2013); 79 Fed.Reg. 13220 (Mar. 10, 2014).

Stated briefly, the Court finds no concerns with the publication and procedure followed by the Treasury in promulgating these final regulations, and sufficient notice is presumed upon publication in the Federal Register. Further, the Tribe has not specified how publication in the Federal Register insufficiently provided it notice and the ability to voice its concerns. Therefore, the Tribe's assertion that it never received sufficient notice is not well-taken and does not excuse any waiver.

Next, the Court considers whether the Tribe's failure to participate in the public process is excused because waiver only applies to procedural challenges whereas this is a substantive challenge.[9] The Tribe offers two cases from the Court of Appeals for the District of Columbia Circuit and a specially concurring opinion from an appeal in the Tenth Circuit as support for its position: *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Reserve Sys.,* 195 F.3d 28 (D.C.Cir.1999); *Graceba Total Comm'ns, Inc. v. F.C.C.,* 115 F.3d 1038 (D.C.Cir.1997); *Big Horn Coal Co. v. Temple,* 793 F.2d 1165 (10th Cir.1986). Essentially, the three cited cases state a party is not required to participate in the notice-and-comment period to raise a later substantive challenge to an agency's rulemaking in a court of law. Judge Barrett commented in his specially concurring opinion in the 1986 case of *Big Horn Coal Co.* as follows:

> The rule **should** be that unless a petitioner can demonstrate that an agency rule is invalid *ab initio* because it is constitutionally infirm or exceeds the agency's statutory authority, the petitioner is estopped from challenging the procedural promulgation of the rule after the time period for filing such a challenge has expired, regardless of whether petitioner objected during the notice and comment period.

*Big Horn Coal Co.,* 793 F.2d at 1170 (Barrett, J., specially concurring) (emphasis

9. The Tribe's challenge is substantive in that it alleges the Treasury exceeded its authority in enacting the final regulations at issue in this case. A procedural challenge would question whether the Treasury followed the correct process in promulgating the regulations (e.g., whether it published the proposed rules for the required 30–day minimum).

added). Judge Barrett's proposed rule is inviting, but it is not the law in the Tenth Circuit. Both earlier and later cases found waiver applicable in lawsuits where a party attempted to challenge an agency's final decision, both procedurally and substantively, but failed to raise the issue during the public process. *See, e.g., Silverton Snowmobile Club v. U.S. Forest Serv.,* 433 F.3d 772, 783 (10th Cir.2006) (refusing to consider an argument that the agency's decision was arbitrary, capricious, and "illegal as a matter of law" because such argument was not presented to the agency); *New Mexico Envtl. Imp. Div. v. Thomas,* 789 F.2d 825, 835 (10th Cir.1986) (refusing to consider an argument that the agency's decision resulted in "illegal discrimination" because such argument was not presented to the agency during the notice-and-comment period of rulemaking); *see also Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764–65, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (refusing to examine an argument that the agency failed to consider possible alternatives to its final regulations because such argument was not presented to the agency "in order to allow the agency to give the issue meaningful consideration"); *see also Nutraceutical Corp. v. Von Eschenbach,* 459 F.3d 1033, 1041 n. 9 (10th Cir.2006) (finding the party had "generally" advanced enough "dissatisfaction" toward the agency's proposed regulation so as to avoid waiver).

While the specially concurring opinion in *Big Horn Coal Co.* may be appealing, it is not the law. The law applicable to this case says the Tribe is required to present its concerns to the agency during the public rulemaking process in order to afford the agency an opportunity to consider and address the concerns *prior* to enacting a final regulation. Indeed, "the very purpose of [the public notice-and-comment period] is to give interested parties the opportunity to participate in rulemaking and to ensure that the agency has before it all relevant information." *Western Energy Alliance v. Salazar,* 2011 WL 3738240, at *7 (D.Wyo.2011) (unpublished) (quoting *Natural Resources Defense Council v. EPA,* 643 F.3d 311, 321 (D.C.Cir.2011)). Having failed to comment during the extended rulemaking process here, the Tribe cannot now be heard to complain about the end result. The Tribe waived its current challenge to the final regulations when it did not bring the matter to the Treasury's attention during the notice-and-comment period, and the Court will not "consider contentions which were not pressed upon the administrative agency." *Wilson v. Hodel,* 758 F.2d at 1373. Therefore, the Tribe's waiver bars its assertions under the APA.

Once again, however, in an abundance of caution and because waiver is not a jurisdictional concern, *see Kontrick v. Ryan,* 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (jurisdictional issues are limited to those questioning a court's "adjudicatory authority"), the Court will proceed to consider the merits of the motion for preliminary injunction.

### 3. *Preliminary Injunction*

■ The Tribe seeks a preliminary injunction enjoining Defendants from applying the three final regulations at issue to the Tribe while this lawsuit is pending. A preliminary injunction is an extraordinary equitable remedy. *Westar Energy, Inc. v. Lake,* 552 F.3d 1215, 1224 (10th Cir.2009). Its purpose is to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

### 3.1 *Preliminary Injunction Standard*

■ The parties disagree on the appropriate preliminary injunction standard. Ordinarily, for a preliminary injunction to

issue, the moving party must establish four elements:

(1) a substantial likelihood that it will ultimately succeed on the merits of its suit;

(2) it is likely to be irreparably injured without an injunction; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) the injunction, if issued, will not adversely affect the public interest.

*Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir.2010) (citing *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir.2007)). This is the normal preliminary injunction test, but it is only one of three employed by the Tenth Circuit. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1002 (10th Cir.2004) *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Where the case involves a so-called "disfavored injunction," the standard is subjected to a heightened scrutiny; where it involves "serious, substantial, difficult, and doubtful" questions going to the merits, the standard is relaxed. *Id.*

There are three types of disfavored preliminary injunctions that require heightened scrutiny:

(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. When a preliminary injunction falls into one of these categories, it must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. A district court may not grant a preliminary injunction unless the moving party makes a strong showing

both with regard to the likelihood of success on the merits and with regard to the balance of harms.

*Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir.2012) (quoting *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048–49 (10th Cir.2007), *rev'd on other grounds*, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009)). "The heightened standard does not affect the analysis of the other two preliminary injunction factors: irreparable injury and public interest." *Id.* at 1126.

In contrast, the relaxed standard

lessens the need for showing a substantial likelihood of success on the merits: "when the other three requirements for a preliminary injunction are satisfied, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

*Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir.2006) (quoting *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir.1993) (quotations, citations, alterations omitted)).

The Tribe contends the heightened standard does not apply here, but the relaxed standard should. (Doc. 9 at p. 9.) Defendants assert the relaxed standard does not apply. (Doc. 13 at p. 11 n. 8.) The Court agrees with Defendants. The Tenth Circuit explained the relaxed preliminary injunction standard does not apply where the movant seeks to stay governmental action taken pursuant to a statutory or regulatory scheme.

However, in *Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir.2003), we held that "[w]here ... a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the less rigorous fair-ground-for-litiga-

tion standard should not be applied." *Id.* at 1189 (*quoting Sweeney v. Bane,* 996 F.2d 1384, 1388 (2d Cir.1993)) (further quotations omitted) (citations omitted). We therefore decline to apply the "liberal definition" of *Autoskill.*

*Aid for Women v. Foulston,* 441 F.3d 1101, 1115 (10th Cir.2006). Moreover, the Tenth Circuit presumes "that all governmental action pursuant to a statutory scheme [such as the ACA] is 'taken in the public interest.'" *Id.* at 1115 n. 15. Therefore, the Court concludes the relaxed preliminary injunction standard does not apply here.

Additionally, the heightened standard does not apply either. The only question is whether a preliminary injunction would grant the Tribe all the relief it could recover at a merits trial.

> The only reason to disfavor a preliminary injunction that grants substantially all the relief sought is if it would render a trial on the merits largely or completely meaningless. Therefore, all the relief to which a plaintiff may be entitled must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone.

*Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1247 (10th Cir.2001) (internal citation and quotations omitted). Here, if the Tribe was awarded a preliminary injunction preventing it from being subject to the large employer mandate during the pendency of this proceeding, such could be undone by a final order following a merits trial. Accordingly, the Court concludes the heightened preliminary injunction standard does not apply here.

### 3.2 *Analysis*

Having determined the ordinary preliminary injunction standard applies to the Tribe's request, the Court next examines the merits of the motion.

### 3.2(a) *Substantial Likelihood of Success on the Merit s*

■ The Tribe contends it is likely to succeed on the merits of the case because the Treasury's final regulations conflict with the ACA. (Doc. 9 at pp. 10–21.)

In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the language of the statute. If the statute is clear and unambiguous that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress. In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole. If the statute is silent or ambiguous with respect to the specific issue addressed by the regulation, the question becomes whether the agency regulation is a permissible construction of the statute. If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute.

*K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (internal citations and quotations omitted). Essentially, the question in this case boils down to whether the Treasury's final regulations collide with Congress's intent when it passed the ACA. For the reasons discussed below, the Court finds § 4980H is unambiguous and the Treasury's final regulations are consistent with the ACA.

■ Congress expressed its intent in § 4980H that the large employer mandate

apply to all large employers, including Indian tribes. The individual mandate explicitly excludes specific individuals from its requirements (26 U.S.C. § 5000A(d)(1)-(4)) and also exempts certain individuals (including Native Americans) from the associated tax penalty (*id.* § 5000A(e)(1)-(5)). In contrast, the large employer mandate exempts no large employers from its exaction (save for employers of seasonal workers who only reach the 50–employee threshold as a result of seasonal workers). *See id.* § 4980H(c)(2)(B). This difference aptly demonstrates that Congress was fully capable of exempting Indian tribes from the large employer mandate if it so intended. "Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally." *Nat'l Fed'n,* 132 S.Ct. at 2583 (citing *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)).

Additionally, the Tribe's assertion that Congress meant to exclude it from the large employer mandate because it did not expressly state the large employer mandate applies to Indian tribes is not well-taken. Section 4980H defines the subject large employers as, "with respect to a calendar year, an employer who employed an average of at least 50 full-time employees on business days during the preceding calendar year." 26 U.S.C. § 4980H(c)(2)(A). It is true, as the Tribe argues, that nowhere in § 4980H did Congress specify Indian tribes to be subject to the large employer mandate. *See id.* § 4980H. Failure to specify Indian tribes as large employers is not enough, however. If Congress wished to exempt Indian tribes from this mandate that otherwise might be reasonably construed as applying to them, it needed to do so explicitly. *Chickasaw Nation v. United States,* 208 F.3d 871, 880 (10th Cir.2000), *aff'd,* 534 U.S. 84, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). *See also United States v. Wells*

*Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988) ("[E]xemptions from taxation ... must be unambiguously proved"); *Squire v. Capoeman,* 351 U.S. 1, 6, 76 S.Ct. 611, 100 L.Ed. 883 (1956) ("[T]o be valid, exemptions to tax laws should be clearly expressed"); *United States Trust Co. v. Helvering,* 307 U.S. 57, 60, 59 S.Ct. 692, 83 L.Ed. 1104 (1939) ("Exemptions from taxation do not rest upon implication"). Congress's decision not to expressly exempt Indian tribes as large employers suggests Congress intended them to be subject to the large employer mandate.

Further, the Tribe's reliance upon *Dobbs v. Anthem Blue Cross & Blue Shield,* 600 F.3d 1275, 1283 (10th Cir.2010) (*Dobbs II* ), is unavailing. (*See* Doc. 9 at pp. 14–16.) The Tribe relies on the following paragraph from *Dobbs II* to suggest the Tribe is automatically exempt from the large employer mandate unless expressly included therein:

In this circuit, respect for Indian sovereignty means that federal regulatory schemes do not apply to tribal governments exercising their sovereign authority absent express congressional authorization [citations omitted].... Although our early cases relied in part on treaties that expressly protected Indian tribes' sovereignty, *see, e.g., Donovan* [*v. Navajo Forest Products Industries* ], 692 F.2d [709] at 711–12 [ (10th Cir.1982) ], we later recognized that a treaty was not a necessary prerequisite to exemption, *see, e.g., Pueblo of San Juan,* 276 F.3d at 1191.

*Dobbs II,* 600 F.3d at 1283–84. This principle does not apply in the instant case, though. The Tribe is not asserting the ACA interferes with the exercise of its sovereign authority. *See id.* at 1283 n. 9 ("We have distinguished, however, between cases in which an Indian tribe exer-

cises its property rights and cases in which it 'exercise[s] its authority as a sovereign.'") (quoting *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1199 (10th Cir. 2002)). The Tribe does not contend the ACA is interfering with its own sovereign healthcare system or other tribal law. Instead, at its core, the Tribe's argument is that its inherent sovereign authority permits it to pick and choose the parts of the ACA it finds most beneficial while avoiding being subject to the remainder. Such cherry picking is not the exercise of sovereign authority.[10] Quite understandably and appropriately, the Tribe wants to achieve the greatest possible benefit under the ACA for its tribal employees. This desire, though, is not the exercise of sovereign tribal governance.

Moreover, the Tenth Circuit has explained an Indian tribe's sovereign authority is not compromised where federal legislation affects the tribe's "proprietary capacity such as that of employer or landowner." *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1199 (10th Cir.2002). The exercise of authority in a proprietary capacity (here, as an employer) is distinct from the exercise of authority as a sovereign. *See id.*

> The legislative enactment of the Pueblo's right-to-work ordinance was also clearly an exercise of sovereign authority over economic transactions on the reservation. This distinguishes the Pueblo's exercise of sovereign authority here from a congressional enactment like that in [*Fed. Power Comm'n v.]* Tuscarora [Indian Nation, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960),]

which did not affect tribal legislative policy but instead impacted proprietary interests.

*Id.* at 1200. Here, in contrast to *Pueblo of San Juan*, the Tribe has not asserted the ACA affects tribal legislative policy. Instead, it impacts the Tribe's proprietary capacity as an employer.

Next, there is no dispute the ACA is an act of general applicability. "[I]t is now well settled by many decisions of [the United States Supreme Court] that a general statute in terms applying to all persons includes Indians and their property interests." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960).

> When a federal law of general applicability is silent on the issue of applicability to Indian tribes, we have explained that it applies equally to Indians unless: "(1) the law touches 'exclusive rights of self-governance in purely intramural-matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations....'"

*United States v. Fox*, 573 F.3d 1050, 1052 (10th Cir.2009) (quoting *Nero v. Cherokee Nation of Oklahoma*, 892 F.2d 1457, 1462–63 (10th Cir.1989) (citation omitted)). First, the large employer mandate of § 4980H does not affect exclusive rights of the Tribe's self-governance and does not concern purely intramural matters. Second, applying the large employer mandate

10. *Dobbs II* provides a good comparison. In that case, the Indian tribe had exercised its tribal sovereignty by purchasing a health insurance plan for its employees, much like many local and state governments do for its employees. *Dobbs II*, 600 F.3d at 1284. The Tenth Circuit found, "Applying ERISA to such plans would prevent tribal governments from purchasing insurance plans for governmental employees in the same manner as other government entities, thus treating tribal governments as a kind of inferior sovereign." *Id.* Here, in contrast, the Tribe mentions no desire or intent to govern the health insurance coverage of its employees.

to the Tribe would not "abrogate rights guaranteed by Indian treaties." On this topic, the Tribe offered the "Treaty with the Northern Cheyenne and Northern Arapaho, 1868" at the preliminary injunction hearing. The Tribe highlighted the following passage from the 1868 Treaty as support for its assertion that the large employer mandate affects its treaty rights:

> ARTICLE 7. The United States hereby agrees to furnish annually to the Indians who settle upon the reservation a physician ... as herein contemplated, and that such appropriations shall be made from time to time on the estimates of the Secretary of the Interior as will be sufficient to employ such persons.

Considering the plain language, there is simply no suggestion that the ACA's large employer mandate abrogates rights guaranteed by Article 7 of the 1868 Treaty. Nothing in § 4980H addresses the United States' agreement to furnish a physician to the Tribe. It simply does not apply in this case. The Tribe has not demonstrated how the large employer mandate would, or even could, abrogate rights guaranteed to it by treaties. Third and finally, as discussed above, the language employed by Congress in § 4980H suggests it intended the large employer mandate to apply to Indian tribes. The Tribe has not identified any legislative history or some other means that would suggest the opposite. Thus, the ACA, as a federal law of general applicability, applies equally to Indian tribes.

Finally, the Tribe asserts "the Court must apply the Indian canons of construction, which require that federal statutes be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit." (Doc. 9 at p. 23); *see Montana v. Blackfeet Tribe,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). The Court has found no ambiguity in § 4980H, though; therefore, the canons of statutory interpretation favoring

liberal construction in Indians' favor do not apply here. *See Chickasaw Nation v. United States,* 534 U.S. 84, 99, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (turning to canons of construction, including Indian canon, only after "nothing in the text, legislative history, or underlying policies" resolved an ambiguity in the Indian Gaming Regulatory Act); *South Carolina v. Catawba Indian Tribe,* 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986) (the Indian canon means that "doubtful expressions of legislative intent must be resolved in favor of the Indians"). Here, the Court finds no doubtful expression of Congress's intent.

In sum, the Court finds 26 U.S.C. § 4980H is clear and unambiguous. Congress knew how and expressly chose to exclude Native Americans from the penalty provision of the individual mandate, but intended not to exclude Indian tribes from the large employer mandate.

Turning now to the final regulations, the Court finds they are consistent with the congressional intent expressed in § 4980H. The Treasury's three final regulations challenged here include Indian tribes (among others) as entities subject to the large employer mandate. *Compare, e.g.,* 26 C.F.R. § 301.6056–1(b)(7) (defining "governmental unit" to include Indian tribal governments) *with* 26 U.S.C. § 6056(e) (describing the reporting requirements for large employer governmental units to show compliance with the large employer mandate). Accordingly, the three final regulations challenged in this case accurately reflect Congress's intent that Indian tribes be subject to the large employer mandate. Therefore, the Court concludes the Tribe has not shown it is likely to succeed on the merits.

### 3.2(b) *Likelihood of Irreparable Harm*

Parties seeking preliminary injunctions must "demonstrate that irrepa-

rable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (emphasis in original). The Tribe asserts the Treasury's final regulations infringe "on tribal sovereignty, treaty rights, and rights created by the ACA." (Doc. 9 at p. 31.) As discussed above, the Court has found the final regulations do not infringe on the Tribe's sovereign authority or treaty rights. Further, the Tribe concedes its expenses under the large employer mandate are projected to decrease from their current levels. (Doc. 9 at p. 12 n. 2.)

The "rights created by the ACA" referenced by the Tribe concern the premium tax credits and reduced cost-sharing incentives its Indian employees qualify for when obtaining individual health insurance plans through an exchange.[11] (*See id.* at pp. 31–33.) The ACA did not create such incentives as "rights," though. The ACA created a floor or lower level of health insurance a large employer must offer to its employees; it does not create any right to the best-available, lowest-cost health insurance. The Tribe equates the loss of these incentives to the loss of health insurance for its Indian employees. (*See id.* at pp. 32–33 (discussing *United Steelworkers of America, AFL–CIO v. Textron, Inc.,* 836 F.2d 6 (1st Cir.1987)).) The truth is in fact nearly the opposite. By being subject to the large employer mandate, the ACA requires the Tribe to offer sufficient health insurance to its Indian members. In contrast, the decision to obtain health insurance on the exchange is left to individual tribe members (because they are exempt from the individual mandate's tax penalty). There is no loss of health care coverage associated with the Tribe being subject to the large employer mandate. If, as the Tribe fears, its Native American employees choose to forego health insurance altogether rather than obtain it through their employer, such is an acceptable choice expressly reserved to them by Congress under the ACA.

The choice the Tribe faces under the large employer mandate (offering health insurance to its employees versus facing significant tax consequences for its failure to comply) is undoubtedly a dilemma. However, Congress intended for large employers, including the Tribe, to face this dilemma when it passed the ACA. The Court finds the Tribe has not shown it faces likely irreparable harm in the absence of a preliminary injunction.

### 3.2(c) *Balancing of Potential Harms*

■ The third factor in the preliminary injunction analysis requires the movant to show its threatened injury outweighs any potential injury to the non-moving party. As discussed above, the Tribe (and its Indian employees) faces little to no irreparable harm absent a preliminary injunction. In contrast, "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *Cornish v. Dudas,* 540 F.Supp.2d 61, 65 (D.D.C.2008). Stated simply, the Tribe has not established its potential harm outweighs the Defendants' potential harm.

### 3.2(d) *Effect on Public Interest*

■ Finally, the issuance of the preliminary injunction would be adverse to the public interest. It would interfere with Congress's intent in passing the

11. At the preliminary injunction hearing, the Tribe asserted it brings this lawsuit on behalf of its members in a *parens patriae* fashion, which allows it to argue the positions of its members. The Court assumes without deciding the Tribe has standing to advance the arguments of its tribal members.

ACA's large employer mandate. Specifically, as part of the ACA's goal "to increase the number of Americans covered by health insurance," *Nat'l Fed'n*, 132 S.Ct. at 2580, Congress intended the large employer mandate to build upon the employer-based health care coverage system already existing in the United States. The Tenth Circuit presumes "that all governmental action pursuant to a statutory scheme [such as the ACA] is 'taken in the public interest.'" *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n. 15 (10th Cir. 2006).

Indeed, those facing the most harm from this preliminary injunction decision may well be those employees of the Tribe who are not Native Americans, about 18% of the Tribe's workforce. (Conrad Decl. ¶ 2.) If a preliminary injunction were issued, they would be subject to the individual mandate, yet their employer, a large employer employing far more than 50 full-time employees, would be exempt from offering them a health insurance plan. This final factor weighs against any preliminary injunction.

### 3.3 Conclusion: A Preliminary Injunction Shall Not Issue

In summary, all four factors of the preliminary injunction standard weight against the Tribe's request for preliminary injunction. Accordingly, the Tribe has not established its right to this "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008).

### *CONCLUSION AND ORDER*

For the reasons discussed above, the Court concludes this action is barred by the Anti-Injunction Act and the Tribe's arguments were waived during the public rulemaking process. Assuming arguendo that those threshold issues did not preclude the Tribe's motion for preliminary injunction, the Court finds the factors

weigh against issuing a preliminary injunction. Congress intended the ACA's large employer mandate to apply to the Tribe.

**It is therefore ordered** that the Northern Arapaho Tribe's Motion for Preliminary Injunction (Doc. 8) is hereby **denied.**